UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| HOOSIER ENVIRONMENTAL COUNCIL, et. al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:19-cv-00071-TLS-JEM |
| NATURAL PRAIRIE INDIANA FARMLAND HOLDINGS, LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' CONSILIDATED REPLY IN SUPPORT OF THEIR CLAIM UNDER
THE ADMINISTRATIVE PROCEDURE ACT**

Plaintiffs, by counsel, hereby submit this consolidated reply to: (1) the Federal Defendants'

Brief in Support of Their Cross-Motion for Summary Judgment and Opposition to Plaintiffs'

Motion for Summary Judgment ("Corps Resp. Br."); and (2) Natural Prairie's Response to

Plaintiffs' Opening Brief ("NP Resp. Br.") as follows:

**I.      The APA Standard of Review Does Not Require this Court to Rubber Stamp the
Corps' AJD Findings**

The Corps correctly states that this Court's APA review is limited to determining whether

the challenged AJD findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." Corps Resp. Br. at 10 (quoting 5 U.S.C. § 706(2)(A)). While that standard

prevents the Court from substituting its judgment for that of the Corps, it does not mean that the

Court is simply a "rubber-stamp" for the agency's decision-making. *Ohio v. Ruckelshaus*, 776 F.2d

1333, 1339 (6th Cir. 1985) ("The principle of deference does not permit the court to become a

rubber stamp, automatically approving every agency interpretation of a statute."); *Am. Paper Inst.

v. Train*, 177 U.S. App. D.C. 181, 543 F.2d 328, 338 (1976) (the arbitrary and capricious standard

of review "does not mean however that we must rubber-stamp agency decision-making.") Rather,

it is the court's "duty to ensure that the agency's decision is based on a consideration of *all relevant factors*" and the court's "inquiry must be *searching and careful*, especially in highly technical cases." *Am. Paper Inst.,* 543 F.2d at 338 (emphasis added); *see also NVE Inc. v. HHS,* 436 F.3d 182, 190 (3d Cir. 2006) ("To determine whether an agency acted arbitrarily and capriciously, a court looks to whether the agency relied on factors outside those Congress intended for consideration, *completely failed to consider an important aspect of the problem*, or provided an explanation that is *contrary to, or implausible* in light of, the evidence") (emphasis added).

Moreover, while an agency's interpretation of its own regulations is entitled to deference, the degree of deference to be given "depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Saint Mary of Nazareth Hosp. Ctr. v. Schweiker*, 231 U.S. App. D.C. 47, 718 F.2d 459, 463-64 (1983) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 89 L. Ed. 124, 65 S. Ct. 161 (1944)). Finally, an agency's conclusory statements generally will not constitute reasoned decision making sufficient to survive arbitrary and capricious review. *See Am. Horse Prot. Ass'n, Inc. v. Lyng,* 258 U.S. App. D.C. 397, 812 F.2d 1, 6 (D.C. Cir. 1987).

Here, the Corps' no wetlands finding should not be rubber-stamped by this Court. As the Corps explains it, that finding is supported by historic aerial photos confirming that the Site has been in continuous agricultural use—representing the Site's "normal circumstances"—and "has not met wetlands criteria, in its recent past, and potentially for as long as 80 years." Corps Resp. Br. at 1. As discussed in Plaintiffs' Opening Brief and further below, the problem with the Corps' argument is that a site that has been in continuous agricultural use for 80 years does not rule out the presence of farmed wetlands—a type of regulated wetland that by definition lacks one or more of the wetland indicators precisely due to continuous farming activities. Yet, there is no indication

*anywhere* in the administrative record that the Corps considered whether farmed wetlands exist or did exist before Natural Prairie altered the Site's hydrology by filling numerous ditches and draining groundwater to make way for its CAFO. The Corps' insistence that it was not required to follow the procedures for assessing this major type of wetland is contrary to Corps' regulations and established guidance and is further confirmation that the Corps failed to consider all relevant factors and an important aspect of the problem.

Similarly, the Corps' AJD finding that the lateral ditches Natural Prairie filled prior to seeking the AJD are somehow *existing* "irrigation canals excavated out of upland" (AR0436) is not entitled to this Court's rubber stamp. Not only does this finding obscure the fact that the lateral ditches had already been filled and tiled at the time of the AJD, it is contradicted by overwhelming evidence confirming that those laterals were *drainage,* not irrigation ditches. Moreover, this finding fails to address the key question—which is, whether those filled drainage ditches had relatively permanent flow *before* Natural Prairie filled them. The Corps' after-the-fact argument now that it actually did assess the flow characteristics of these filled ditches by looking at another ditch, historic aerial photos, and resource maps simply confirms, as discussed below, that the Corps did not follow its own established guidance on this issue. Moreover, the Corps' new finding is not found anywhere in the AJD, nor is it supported by record evidence.

## II.    Plaintiffs Accurately Presented Material Facts Based on Credible Evidence

Before discussing these issues further, it is necessary to address Natural Prairie's contention that Plaintiffs' presentation of the facts is "tainted" with the "legal advocacy" of Plaintiffs' counsel and "concoct[ed] without any discovery to support *her* characterizations." NP

Resp. Br. at 4 (emphasis added).[1] Other than repeatedly scare-quoting the phrase "Material Facts" and summarily declaring that the facts Plaintiffs present "are certainly not undisputed" (NP Resp. Br. at 1, 3-4), Natural Prairie never gets around to demonstrating that the facts presented in Plaintiffs' Opening Brief are not true. Nor can it, because each fact detailed in Plaintiffs' brief is supported with citation to documents that either: (1) are contained in the Corps' administrative record; (2) are Natural Prairie's *own* documents; and/or (3) are government records pertaining to the zoning and IDEM approvals of Natural Prairie's CAFO. Pl. Brief at 3-12. In other words, these are not *Plaintiffs'* documents and they certainly were not "concocted" out of thin air.

Natural Prairie also contends that Plaintiffs' fact statement is "filled with phrases ascribing nefarious motivation to Natural Prairie." (NP Resp. Br. at 4) While Plaintiffs agree that the facts of this case paint a less-than-flattering picture of Natural Prairie, Plaintiffs have accurately presented those facts with citation to credible evidence. For instance, Plaintiffs present Natural Prairie's effort to conceal its ditch-filling and tiling activities from IDEM and the Corps with citation to several documents including, most notably, Natural Prairie's own email communications with its *current* environmental consultant:[2]

> [O]n September 5, 2017, Natural Prairie relayed to Enviro-Ag, "we don't want to discuss ditch closing plans with IDEM or any government entity (Corps)" because doing so "only makes them ask more questions." (Exh. 10 at ENVIRO-

---

[1] By referring to "her" in its disparagement of "Plaintiffs' counsel," Natural Prairie overlooks that Plaintiffs are also represented by Jeffrey Hyman, an attorney with the Conservation Law Center and clinic professor at Indiana University Mauer School of Law. Along with Ms. Ferraro, Mr. Hyman contributed to and signed Plaintiffs' Opening Brief thereby certifying to the Court "that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstance" that "the factual contentions have evidentiary support." Fed. R. Civ. P 11(b)(3). Unfortunately, this is not the first time Natural Prairie has resorted to *ad hominem* attacks on Plaintiffs' counsel. *See* Natural Prairie's Brief in Support of its Motion to Dismiss, Dkt. 23 at 2-3; and Plaintiffs' Response to Natural Prairie's Motion to Dismiss, Dkt. 29 at 3-4.

[2] In its response to Plaintiffs' Motion to Admit Extra-Record Materials ("MXRE"), Natural Prairie attempts to discredit the affidavit testimony of its former environmental consultant, who likewise confirms that Natural Prairie told him not to contact the Corps before filling ditches (Exh. 4), by characterizing him as "jilted former consultant" who is "attempt[ing] to smear the company as payback for lost business." NP Resp. to MXRE at 2. Natural Prairie makes this charge without any evidence. But, in any event, the former consultant's testimony is supported by email communications with Natural Prairie. *See e.g.,* Exh. 7 at EW0013-EW0016. Natural Prairie makes no effort to refute this evidence.

AG_002115) Similarly, on January 5, 2018, Natural Prairie instructed Enviro-Ag to advise when "we're getting close to submitting any paperwork [to IDEM]. . . as we'll have to close off some ditches and clear trees by the future lagoon location before IDEM site inspectors come out—helps to avoid any questions about wetlands and other concerns." (Exh. 11 at p. NP_000344).

Pl. Brief at 4-5; *see also* Exh. 9 at 1-2 (internal IDEM communication noting that Natural Prairie "*claim[ed]* no impacts to waterways however the Google maps show the head waters of the Bogus Island Ditch have been newly filled in [and] the foot print of the project is *conveniently* located over the newly filled in area of the ditch") (emphasis added).

Similarly, based on Natural Prairie's own documents, Plaintiffs demonstrate that Natural Prairie's statement to the Corps that it filled ditches for "crop reasons" is not true (Pl. Brief at 2, 11):

Will, See attached drainage tile install and ditch closing proposal from Matt DeYoung and Allen Howe. Matt and I discussed this proposal at length this morning. I have a good understanding of how much the cost will be reduced if the Dairy facility is moved to a location that does not require ditch closing. Are you available for a call today?

Exh 8c at 2 (July 21, 2016 email from Earthwise to Natural Prairie's Will DeJong) [3]

Will, Per our conversation please see layout options 5, 6, 7. Although Option 7 won't work for you I just wanted to show you a layout without any ditch impact. Option 6 will still require some ditch closing, tile drainage install and berming of ditch banks so the net cost savings may not be that great compared to Option 5. Please let me know if you have any questions.

Exh. 7 at EW0003 (July 22, 2016 email from Earthwise to Will DeJong)

Scott, I like Option 6 best but can we slide the dairy to the left? Are there any advantages with Option 6 as opposed to moving the dairy to the left to make a ¾ pivot on the southwest pivot in that section? I'm just thinking from a logistics standpoint of moving manure and feed from the feed center and manure storage area that we are adding an extra 1/3 – ¼ mile on every trip to/from.

Exh. 7 at EW0003 (July 25, 2016 email response from Will DeJong to Earthwise)

---

[3] Mr. DeJong's signature block in these emails identifies him as the "Director of Midwest Operations" for "AgriVision Farm Management." As the Corps' record indicates, AgriVision and Natural Prairie have the same Texas mailing address and Mr. DeJong is Natural Prairie' agent who requested the AJD from the Corps. AR0070.

We can move the dairy left or west. If we move it too far west then we are closing the ditch on the west.

Exh. 7 at EW0003 (July 25, 2016 email from Earthwise to Will DeJong)

Scott, Maybe I'm not understanding correctly, wouldn't we have to close that ditch regardless if we plan on running manure water through the pivots?

Exh. 7 at EW0004 (July 25, 2016 email from Will DeJong to Earthwise)

Option 8 and 9 have minimal impact on the drainage system as a whole because the ditch to be closed is inconsequential.

Exh. 7 at EW0008 (July 26, 2016 email from Earthwise to Will DeJong)

Thanks Scott, based on what I'm seeing I'm thinking Option 6 still offers the greatest cost reduction (not to mention the savings on dirt work by taking advantage of that sand hill), but Option 8 & 9 should still be a decent cost reduction by allowing us to keep the central east-west ditch in place.

Exh. 7 at EW0012 (July 26, 2016 email from Will DeJong to Earthwise)

Since IDEM requires 300 feet setbacks from any manure storage . . . we may need to adjust the dry cow barn set up temporarily—at least until we close more ditches.

Below is my very amateur sketch of the layout – we know that we closed the length of the east/west ditch up until the intersection of ditches right underneath the 0 point on the map as well as closing 500 feet to the north and 700 feet to the south where the white lines are measured . . .



Exh. 7 at EW0013 (Dec. 30, 2016 email from Will DeJong to Earthwise).

> Severson has pretty much finished the Rule 5 stormwater permit [for the CAFO]
> but we need to close some ditches before submitting.

Exh. 14 at ENVIRO-AG_002678 (Oct. 2, 2017 email from Will DeJong to Enviro-Ag) Clearly, the foregoing documents confirm that the ditches in question were filled to build the CAFO, not to grow crops.

Moreover, Plaintiffs accurately present evidence that the filled "lateral ditches[4]" were not "shallow irrigation channels" as Natural Prairie represented to the Corps. Pl. Brief at 7-8. According to Corps' guidance (RGL 07-02), an *irrigation* ditch "carries <u>only</u> irrigation water, irrigation return flows, and overland flow," whereas a *drainage* ditch "conveys water (other than irrigation related flows) from one place to another." AR0467-0468. Here, Natural Prairie's documents demonstrate that the ditches it filled were several feet deep and drained groundwater, not irrigation water:

- Exh. 12 at 30-42, 71-72 (results of 66 soil borings taken in January and September of 2017, including 13 borings within the footprint of the CAFO, confirming the groundwater table within 30 to 48 inches of the ground surface);[5]

---

[4] For some reason, Natural Prairie takes issue with Plaintiffs' use of this phrase. NP. Resp. Br. at 15. But Plaintiffs are using the terminology that the Corps used to describe these ditches. AR0422 ("The only potential waters on the project site that were considered to be [WOTUS] were Lawler Ditch, Bogus Island Ditch and the *laterals*/canals that connect to the ditches.") (emphasis added).

[5] The Corps asserts that these soil borings were "not transmitted to Natural Prairie until October 7, 2018—well after the date of the AJD." Corps Resp. Br. at 40-41. That is not true. *See* Exh. 10 at ENVIRO-AG_002114 and 002115 (Sept. 5, 2017 email communications between Natural Prairie and its current environmental consultant referring to the Sept. and Jan. 2017 soil borings); Exh. 11 at NP_000343 and 000344 (Jan. 5, 2018 email communications between Natural Prairie and its current environmental consultant discussing the soil borings performed in Sept. 2017); Exh. 14 at ENVIRO-AG_00268 (Oct. 2, 2017 email between Natural Prairie and its current environmental consultant discussing the soil borings reports); Exh. 12 at 3-4 (soil borings report indicating the dates in January and September of 2017 that the soil borings were taken).

- Exh. 13b (August 2016 survey of ditches at issue, before they were filled, confirming ditch-bottom elevations to be 6 to 9 feet below the ground surface and within the water table);

- Exh. 8a at 2 (extensive subsurface drain tile system installed to replace the filled ditches); *see also* AR0072 (confirming the ditches were "enclosed and tile installed to maintain drainage")

- Exh. 10 at ENVIRO-AG_002115 (Natural Prairie internally describing the ditches it filled as drainage ditches).

Plaintiffs present these facts not to "cast aspersions on Natural Prairie" (Corps' Resp. Br. at 38-39), but because Natural Prairie's misstatements relate to material issues in this litigation. In particular, the agency relied on Natural Prairie's representation that the ditches it filled were "shallow irrigation channels" to justify its determination that those ditches were not WOTUS. *See* AR0071-0072 (accepting Natural Prairie's statement that the "irrigation channels" it filled "were shallower" than a remaining unfilled channel and "comprised predominately of grass," and concluding that the filled "irrigation channels . . . may not be considered a [WOTUS];" *see also* AR0436 (AJD finding that, "the irrigation canals do not meet the definition of an a(1)-a(6) water as defined in 33 CFR Part 328 and are not considered to be [WOTUS]").

Furthermore, there are exemptions from 404 permitting including certain dredge and fill activities in "irrigation ditches" and for "normal farming" that include growing crops, but not building a CAFO. 33 U.S.C. § 1344(f)(1)(A), (C); 33 C.F.R. § 323.4(a)(1)(ii), (iii)(C)(2); *Jones v. Thorn,* 1999 U.S. Dist. LEXIS 18777, at *7 (D. Or. Nov. 5, 1999) (the "normal farming activities" exemption does not include "building a barn"); *see also United States v. Huebner*, 752 F.2d 1235, 1239-1240 (7th Cir. 1985).[6] And, as the Corps points out, an otherwise exempt activity is

---

[6] Indeed, the Corps relied on these exemptions to excuse Natural Prairie's filling of Bogus Island Ditch. AR0464, AR0466, AR 0474.

"recaptured" and subject to 404 permitting if the conditions of 33 U.S.C. § 1344(f)(2) are met. (Corps Resp. Br. at 6). Notably, one of those conditions is when the otherwise exempt activity is incidental to converting the land "into a use to which it was not previously subject," 33 C.F.R. § 323.4(c), such as filling ditches on cropland to build a CAFO. *See Borden Ranch P'ship v. U.S. Army Corps of Eng'rs,* 261 F.3d 810, 815 (9th Cir. 2001) (dredge and fill activities associated with "converting ranch land to orchards and vineyards is clearly bringing the land into a use to which it was not previously subject" and, therefore, recaptured and not exempt from 404); *see also United States v. Huebner*, 752 F.2d at 1241-1243.

With these 404 carveouts in mind, it is reasonable to infer that Natural Prairie advised the Corps that it filled and tiled "irrigation channels" for "crop reasons" for the purpose of evading Section 404. And because the Corps relied on that misinformation in issuing the AJD, providing the Court with clear evidence to the contrary is necessary for effective judicial review. *See Amoco Oil Co. v. EPA,* 163 U.S. App. D.C. 162 n.10, 501 F.2d 722, 729 (1974) (a court need not "blind itself" to evidence indicating the "truth or falsity of agency predictions" because a "contrary rule would convert the reviewing process into an artificial game").

Nevertheless, the Corps argues that this evidence is irrelevant because the administrative record indicates that the Corps was aware that Natural Prairie was planning to build a dairy and had filled in ditches prior to seeking the AJD. Corps Resp. Br at 38-39. But that argument misses the point. The record <u>does not</u> reflect that the filled ditches were several feet deep and drained groundwater, which is the key fact issue relative to the Corps' AJD finding that the lateral ditches were non-jurisdictional *irrigation* canals. AR0021, 0025 (providing aerial photos with redlines indicating the location of the filled ditches but providing no information about their depth and function).

Nor does the record reveal that Natural Prairie filled those ditches for *the purpose* of building a dairy, which is the material issue relative to the normal farming exemption and recapture provision. Instead, the record indicates that Natural Prairie filled and tiled ditches "in the interest of improving crop yield on the property" and then *later* decided to build the dairy. AR0016, 0450. Indeed, that is the exact narrative that both Natural Prairie and the Corps now present to this Court. NP Resp. Br. at 4; Corps Resp. Br. at 6. And, other than chastising Plaintiffs for providing the full picture, nowhere in their briefs do the Defendants explain why the AJD—notably, the only document that is appealable and readily available to the public[7]—is written to conceal Natural Prairie's ditch-filling and tiling activities.

In sum, the Defendants' collective attempt to rewrite what happened leading up to the AJD reveals the arbitrary and capricious nature of the Corps' decision-making. Without the evidence demonstrating Natural Prairie's material misstatements, the Court will be unable to evaluate Plaintiffs' APA claim that the Corps' challenged findings are based on "inaccurate, insufficient, misleading, and partial information obtained from Natural Prairie." Pl. Comp. at 37, ¶154. It is for these reasons that Plaintiffs have detailed this material evidence in their Opening Brief, not to disparage Natural Prairie.

## III. The Corps' Admission That it Did Not Look for Farmed Wetlands Confirms the Agency Did Not Consider All Relevant Factors and a Major Aspect of the Problem

Natural Prairie chides Plaintiffs for arguing "over and over again" that "the Corps' AJD is flawed" based on the "premise that Natural Prairie's property *contains* 'farmed wetlands' cut from

---

[7] *See* Army Corps of Engineers, Detroit District Website at https://www.lre.usace.army.mil/Missions/Regulatory-Program-and-Permits/Jurisdiction-Determinations/ (providing access to the Corps' AJDs issued by the Detroit District by year, including the AJD issued to Natural Prairie, but no other related documents at https://www.lre.usace.army.mil/Portals/69/docs/regulatory/AJDs/2018/201700719156A18.pdf?ver=2018-08-29-072240-363).

the floor of Beaver Lake." NP Resp. Br. at 17 (emphasis added).[8] But Plaintiffs have never argued that the Site contains farmed wetlands as a basis for challenging the AJD. Rather, Plaintiffs contend that the AJD's finding of no wetlands is erroneous because, among other reasons, the Corps failed to look for farmed wetlands. Pl. Brief at 19 ("The Corps' failure to look for this major type of wetland is analogous to the agency not looking for tributaries on a property and then declaring the property has no tributaries").

As to that relevant issue, the Corps argues that it was not required to look for farmed wetlands because: (1) aerial imagery confirms that the Site has been in continuous agricultural use since 1939, did not "suggest" or "offer evidence" of wetlands, thus providing sufficient evidence of the Site's "normal circumstances;" and (2) the Site did not present an "atypical situation" requiring the use of alternative procedures because conversion of the Site to agriculture occurred decades ago, i.e., was not *recent*. (Corps Resp. Br. at 14-19) The problem with the Corps' argument on both fronts is that it flatly ignores the Corps' established guidance for conducting wetland determinations on *historic* agricultural lands in the Midwest where wetland was converted to agriculture decades ago and wetland indicators are missing precisely because of that agricultural activity:

> European settlement eventually brought drainage and large-scale conversion of Midwestern wetlands to agriculture, creating some of the richest farmland in the world but also resulting in one of the most intensively drained regions in the United States. . . Iowa has lost 89 percent of its historic wetlands, Missouri 87 percent, Illinois 85 percent, Indiana 87 percent, and Ohio 90 percent (Dahl 1990).
>
> In many cases, however, the use of Midwestern wetlands for agricultural purposes has been accomplished without loss of the underlying wetland hydrology or some

---

[8] Natural Prairie also asserts that Plaintiffs have "not bothered to establish that the [Site] was once covered by Beaver Lake." NP Resp. Br. at 17 fn 6. That is not so. Plaintiffs cite to one of Natural Prairie's own documents to establish this fact. Pl. Brief at 5 (quoting from Exh. 10 at ENVIRO-AG_002114 wherein Natural Prairie's drain tile installer advises that the Site "is [a] low (old lake bed) and can sometimes stand water about 1 feet deep above the existing ground for several days . . .") And Plaintiffs' Complaint cites to sources, including a Corps investigation of adjacent property, showing that this fact is both common knowledge and a matter of public record. *See.* Pl. Comp. at 2 ¶¶5-6 and 18-19 ¶70.

of the natural functions of those wetlands. Often the only alteration of the wetland system has been the removal or management of natural vegetation to facilitate the production of crops . . . or livestock, particularly during dry years. <u>Unless the conversion to agriculture included the installation of an effective drainage system, many *farmed wetlands* retain their natural hydrologic regimes and would *revert* to one or more of the wetland types described in this section if they were not tilled, planted, mowed, or grazed *regularly*. Guidance for identifying wetlands in areas currently used for agriculture is provided in Chapter 5.</u>

AR0266-0267 (emphasis added). In turn, "Chapter 5" of the Corps' guidance explains:

The predominant land use in the Midwest Region is agriculture, <u>which presents a number of challenges to wetland identification and delineation. Wetlands used for agriculture may be considered *atypical* because they generally lack a natural plant community and may be planted in crops or pasture species or altered by mowing, grazing, or other management practices. Soils may be disturbed by *regular cultivation*, at least in the surface layers, and hydrology may be manipulated.</u> Throughout the Midwest, vast areas of <u>historic wetlands</u> have been drained and converted to croplands or pastures. Drainage may be partial so that the site still meets wetland hydrology standards, or it may be effective in removing wetland hydrology completely. Wetland indicators, particularly for hydric soils, may still be present in these areas, making it difficult to distinguish current wetlands from those that have been effectively drained. In addition, recent trends in agricultural drainage include improved groundwater management, involving the manipulation of water tables to conserve both water and nutrients (Frankenberger et al. 2006).

<u>Agricultural drainage systems use ditches, subsurface drainage lines or "tiles," and water-control structures to manipulate the water table and improve conditions for crops</u> (University of Minnesota Extension Service 2006). A freely flowing ditch or drainage line depresses the water table within a certain lateral distance or zone of influence (Figure 47). <u>The effectiveness of drainage in an area depends in part on soil characteristics, the timing and amount of rainfall, and the depth and spacing of ditches or drains. Wetland determinations on current and former agricultural lands *must consider* whether a drainage system is present, how it is designed to function, and whether it is effective in removing wetland hydrology from the area.</u> A number of information sources and tools are listed below <u>to help determine whether wetlands are present on agricultural lands where vegetation, soils, hydrology, or a combination of these factors have been manipulated.</u>

AR0360 (emphasis added).

Markedly missing from both the Corps' and Natural Prairie's response briefs is any mention of this clear guidance much less an explanation for why the Corps did not have to follow it in this case. Indeed, the Corps devotes several pages of its brief to presenting the reasons why it

did not have to follow the procedures for "atypical situations" (Corps Resp. Br. at 14-19), but says nothing about the separate and distinct procedures referenced above for conducting wetland determination on agricultural land. AR0188-0197, 0360-0363 (setting forth separate guidance for atypical situations versus agricultural lands in the Midwest). In turn, Natural Prairie refers the Court to its *Motion to Strike and Dismiss Plaintiffs' Wetland Allegations* as "sufficiently address[ing] Plaintiffs' erroneous 'farmed wetland' stance." NP Resp. Br. at 17. But like the Corps' argument, Natural Prairie's motion to dismiss does not explain why the Corps did not have to follow the agency's established guidance for assessing farmed wetlands. Dkt. 23.[9]

Without a doubt, farmed wetland is a recognized type of wetland that can be a WOTUS. *See* 1993 amendment to CWA regulations at 58 Fed. Reg. 45,008, 45,031–45,034 (Aug. 25, 1993) (the EPA and the Corps will apply the Food Security Act's definition of "farmed wetland" for purposes of defining WOTUS); RGL 90-07, Exh. 20 at 2 ("farmed wetlands are . . . subject to regulation under section 404");[10] *United States v. Hallmark Constr. Co.,* 30 F. Supp. 2d 1033, 1038 (N.D. Ill. 1998). Accordingly, when the Corps is tasked with conducting a wetland determination on agricultural land in the Midwest, it must consider this major type of wetland. This is especially so when the land, as here, is in the watershed of a major river (AR0429), contains jurisdictional tributaries of that river (AR0423), is surrounded by wetlands (AR0053), confirmed to have hydric

---

[9] And Natural Prairie's motion lacks merit for the reasons detailed in Plaintiffs' Response to that motion. Dkt. 29.

[10] The Corps states that "RGL 90-07 is inoperative" except for its discussion of the "exclusion of prior converted cropland" from the definition of WOTUS. Corps Resp. Br. at 41 fn 16. However, the 1993 amendment to CWA regulations that introduces the PCC exemption also distinguishes it from "farmed wetland" per RGL 90-07. 58 Fed. Reg. 45,008, 45,031–45,034. Moreover, the Corps' 1987 Manual continues to present RGL 90-07 as current guidance on the meaning of "normal circumstances" on which the premise for regulating farmed wetland is based. AR0119; RGL 90-07 at 2.

soils throughout (AR0054, 0421),[11] was once a giant lake within the Grand Kankakee Marsh (AR0421), and had its hydrology recently manipulated to convert the Site to another use. *See* AR0266-0267, 0360-0363; RGL 90-07, Exh. 20 at 2. The administrative record confirms the Corps did not look for farmed wetlands and its argument now that it was not required to only proves the Corps failed consider all relevant factors and an important aspect of the problem.

## IV.     Regardless of Whether the Site Presented an "Atypical Situation," the Corps' Reliance on Historic Aerial Imagery to Determine Whether Wetlands Existed Before Natural Prairie Altered the Site Was Insufficient

The Corps correctly explains that an "atypical situation" under Corps' guidance is presented when a site has been "recently altered" and a determination made "that positive indicators of hydrophytic vegetation, hydric soils, and/or wetland hydrology could not be found due to the effects" of that *recent* alteration. Corps Resp. Br. at 16 (emphasis in original). Conducting wetland determinations in these "atypical situations" situations, requires the Corps to, among other things, "describe the type of alteration that occurred," "determine the date" of the alteration and its effect, and "obtain all possible evidence that may be used to characterize" the site's hydrology, soils, and vegetation prior to the alteration. (AR 0189-0197)

Here, despite Natural Prairie's *recent* alteration of the Site, the Corps claims it did not have to follow the guidance for "atypical situations." Corps Resp. Br. at 14-19. In support, the Corps contends that it was able to determine that no wetlands existed prior to Natural Prairie's activities based on historic aerial imagery that confirmed the Site has been in agricultural use since 1939, representing its "normal circumstances" and, in the agency's view, did not "suggest wetlands

---

[11] The Corps tries to cast doubt on this wetland indicator stating the "soil survey *suggested* the *potential* presence of hydric soil." Corps Resp. Br. at 8 (emphasis added). Yet, in the Corps' record it confirms that the soil survey "maps the majority of the site as a hydric soil." (AR00421) In any event, the Corps' job was to determine whether the Site's soils "have been adequately characterized" (AR0157), and if there was any doubt, the agency had ready access to the soil testing Natural Prairie conducted in 2017 and 2018 confirming hydric soils throughout the Site. Exh. 12 at 4.

within the project area." Corps Resp. Br. at 17. There are at least three problems with the Corps' argument.

First, relying on historic aerial imagery to rule out the presence of farmed wetlands at the Site before Natural Prairie altered it was not enough. As discussed above, Corps' guidance directs that "[w]etland determinations *on current and former* agricultural lands *must consider* whether a drainage system is present, how it is designed to function, and whether it is effective in removing wetland hydrology from the area[,]" which "depends in part on soil characteristics, the timing and amount of rainfall, and the depth and spacing of ditches or drains." AR360 (emphasis added) Put another way, to determine if farmed wetlands existed before Natural Prairie altered the Site—i.e., the *former* agricultural land—the Corps was required to make *some* assessment of historic rainfall and the design, function, and effect of the Site's drainage system as it existed prior to Natural Prairie installing an extensive network of subsurface drain tiles and filling numerous ditches. The agency clearly did not do this.

Furthermore, in assessing agricultural land for wetlands, Corps' guidance directs using certain procedures and resources to determine: (a) "the plant community that would occupy the site under normal circumstances, if the vegetation were not cleared or manipulated[;]" (b) "whether hydric soils are present" despite mixing and compaction of the surface layer "below the tilled zone . . . due to the weight and repeated passage of farm machinery[;]" and (c) whether "under normal circumstances . . . wetland hydrology is present on agricultural lands . . . [that] may or may not have been hydrologically manipulated." AR0360-0363.[12] Those procedures go far beyond just looking at historic aerial imagery. *See also* Pl. Brief at 21-22 for further discussion.

_____

[12] According to Corps guidance, "[t]he mere presence of drainage structures in an area is not sufficient basis for concluding that a hydric soil has been drained; such areas may continue to have wetland hydrology." AR0137

Second, even if looking at aerial photos alone was sufficient to determine if farmed wetlands existed prior to Natural Prairie's Site alteration, the Corps' conclusory statement that the aerial photos did not "offer evidence" of wetlands is not entitled to deference. Other than repeating this conclusion throughout its brief (Corps Resp. Br. at 13, 14 17), the Corps does not provide any analysis or explanation as to why, in its view, the aerial photos do not provide evidence of wetlands. Similarly, other than stating the obvious—that the photos show "row cropping" and "continual farming"—nowhere in the administrative record does the Corps describe any aspect or particular observation it made in the aerial photos that confirm the Site did not have wetlands before Natural Prairie altered it. AR0421, 0436.

This failure to provide any explanation for such a critical finding is itself contrary to Corps guidance on the use of historic aerial imagery to assess wetland indicators on agricultural land. As to vegetation, Corps guidance cautions that such imagery should only be used "[i]f the conversion to agriculture was recent and the hydrology of the site was not manipulated." AR0361. That is certainly not the situation here. There is no dispute that Beaver Lake and the Grand Kankakee Marsh were drained for farming long ago. It is no surprise then that the historic photos show row crops but not wetland vegetation, which is precisely the problem with identifying farmed wetlands. AR0360; 58 Fed. Reg. 45,008 at *45,032.

As to determining the presence of hydric soils on agricultural land, Corps guidance does not even suggest using historic aerial images. Instead, agency guidance advises that a "standard soil profile description and examination for hydric soil indicators are usually sufficient" and identifies the use of NRCS soil survey maps among "other options and information sources." AR0362. Here, the soil survey map confirms the majority of the Site has hydric soils (AR0054,

0421), but if the Corps had any doubt,[13] the agency had ready access to the extensive soil testing

Natural Prairie conducted in 2017 and 2018 confirming hydric soils (and a high water table)

throughout the Site. Exh. 12. But, in any event, the aerial photography has nothing meaningful to

offer with respect to hydric soils as a wetland indicator.

      That leaves the propriety of using historic aerial imagery to evaluate the hydrology of the

Site before Natural Prairie altered it. On that front, Corps guidance recommends doing so in

accordance with the "procedure given by the USDA Natural Resources Conservation Service"

(AR0362-0363), and further explains that when viewing such imagery for wetland hydrology:

> Saturated areas generally appear as darker patches within the field . . . [but] care
> must be used . . . because . . . [s]aturation may be absent from a wetland during the
> normal dry season or during extended periods of drought. Even under normal
> rainfall conditions, some wetlands do not become inundated or saturated every year
> (i.e., wetlands are inundated or saturated at least 5 out of 10 years, or 50 percent or
> higher probability). If available, it is recommended that multiple years of
> photography be evaluated. If 5 or more years of aerial photography are available,
> *the procedure* described by the USDA Natural Resources Conservation Service
> (1997, section 650.1903, and associated state wetland mapping conventions) is
> recommended in actively farmed areas.

AR0354-0355, 0360 (emphasis added).  As to the NRCS procedure to be used, the agency's

guidance describes it this way:

> The procedure uses five or more years of *growing-season* photography and
> evaluates each photo for wetness signatures that are listed in "wetland mapping
> conventions" developed by NRCS state offices. Wetland mapping conventions can
> be found in the electronic Field Office Technical Guide (eFOTG) for each state
> (*http://www.nrcs.usda.gov/technical/efotg/*). . . Wetness signatures . . . may include
> surface water, saturated soils, flooded or drowned-out crops, stressed crops due to
> wetness, differences in vegetation patterns due to different planting dates, inclusion
> of wet areas into set-aside programs, unharvested crops, isolated areas that are not
> farmed with the rest of the field, patches of greener vegetation during dry periods,
> and other evidence of wet conditions (see Part 513.30 of USDA Natural Resources
> Conservation Service 1994).
>
> For each photo, the procedure described in item b above is used to determine
> whether the amount of rainfall in the 2 to 3 months prior to the date of the photo

---

[13] *See also supra* at FN 11.

was normal, below normal, or above normal. Only photos taken in normal rainfall years, or an equal number of wetter-than-normal and drier-than-normal years, are used in the analysis. If wetness signatures are observed on photos in more than half of the years included in the analysis, then wetland hydrology is present. Data forms that may be used to document the wetland hydrology determination are given in section 650.1903 of USDA Natural Resources Conservation Service (1997).

AR0381-0382 (emphasis added). There is no indication anywhere in the record that the Corps did this when it evaluated historic aerial imagery to assess the Site's hydrology as it existed before Natural Prairie came along and altered it.

For that matter, of the 15 aerial photos included in the administrative record, only six even provide the month they were taken, much less provide information anywhere in the record about the amount of rainfall or drought conditions in those years. (AR0085-0099) Nor does the Corps provide even the slightest insight into why it believes the dark areas that are clearly seen in these 15 photos do not represent saturated areas, especially given that those dark areas correspond to low-lying areas of the Site with hydric soils. AR0100, 0104. Thus, the Corps' conclusory statement that the aerial photos do not "suggest" or "offer evidence" of wetlands does "not constitute reasoned decision making sufficient to survive arbitrary and capricious review. *See Am. Horse Prot. Ass'n, Inc. v. Lyng,* 812 F.2d at 6.

Third, contrary to the Corps' view, Natural Prairie's Site did present an "atypical situation" under agency guidance. While the Corps is correct that the procedures for atypical situations are "used only when a determination has already been made . . . that positive indicators of hydrophytic vegetation, hydric soils, and/or wetland hydrology could not be found due to effects of *recent* human activities or natural events" (Corps Resp. Br. at 16) (emphasis in original), as discussed above, the Corps did not rationally make that determination here.

Furthermore, simply because the Site was converted to row cropping long ago does not mean, as the Corps contends, that *all* forms of "agricultural use" represent the Site's normal

circumstances. Corps Resp. Br. 16-18. Specifically, agency guidance explains that, "[t]he determination of whether normal circumstances exist in a disturbed area "involves an evaluation of the extent and *relative permanence* of the physical alteration of wetlands hydrology and hydrophytic vegetation . . ." AR0119 (quoting RGL 90-07) (emphasis added). As applied to altered "wetlands used for agriculture, [they] *may be considered atypical* because they generally lack a natural plant community and may be planted in crops or pasture species or altered by mowing, grazing, or other management practices." AR360 (emphasis added). Moreover, "[t]he mere presence of drainage structures in an area is not sufficient basis for concluding that a hydric soil has been drained; such areas may continue to have wetland hydrology." AR0137

Put another way, evidence of continued historic row cropping and presence of drainage structures alone presents an atypical situation because row cropping is <u>not permanent</u>—it can be ceased at any time and is, therefore, not considered part of a site's normal circumstances. This is precisely the rationale relied on by the Corps and EPA for regulating farmed wetlands but not prior converted cropland ("PCC"):

> The definition of "normal circumstances" . . . is based upon the premise that for certain altered wetlands, even though the vegetation has been removed by cropping, the basic soil and hydrological characteristics remain to the extent that hydrophytic vegetation would return *if the cropping ceased*. This assumption is valid for "farmed wetlands" and as such these areas are subject to regulation under section 404.
>
> In contrast to "farmed wetlands", "prior converted croplands" generally have been subject to such extensive and *relatively permanent* physical hydrological modifications and alteration of hydrophytic vegetation that *the resultant cropland constitutes the "normal circumstances"* for purposes of section 404 jurisdiction. Consequently, the "normal circumstances" of prior converted croplands generally do not support a "prevalence of hydrophytic vegetation" and as such are not subject to regulation under section 404.

Exh. 20, RGL 90-07 at 2; 58 Fed. Reg. 45,008 at *45,031-45,033 (explaining the foregoing rationale for regulating farmed wetlands but not PCC based on RGL 90-07); *see also* AR360 (explaining "[u]nless the conversion to agriculture included the installation of an *effective* drainage

system, many *farmed wetlands* retain their natural hydrologic regimes and would *revert* to one or more of the wetland types described in this section if they were not tilled, planted, mowed, or grazed *regularly"*) (emphasis added). Combined with record evidence that that the Site was part of the Grand Kankakee Marsh (AR0421), in a low-lying area (AR0439) located within the Kankakee River watershed (AR0429) with at least two jurisdictional tributaries of the Kankakee (AR0423), literally surrounded by wetlands on its southern and eastern borders (AR0053), confirmed to have hydric soils on most of the Site (AR0054, 0421), and recently filled and drained by an out-of-state dairy company purportedly for "crop reasons" (AR0014-0016), should have alerted the Corps that conditions at the Site did not present its normal circumstance.

Nevertheless, the Corps argues that even if "the Site might still have hydric soils or wetlands hydrology in some areas," the AJD finding of no wetlands is sound because to be a wetland, "a site's 'normal circumstances' must typically reflect the presence of all three wetland indicators: hydric soils, wetland hydrology, and the presence of wetland vegetation." Corps Resp. Br. at 18 fn 7. While it is true that a wetland *typically* must reflect all three indicators, a farmed wetland, by definition, is *atypically* missing one of those three indicators—i.e., it is cropped land with hydric soils and wetland hydrology, but no wetland vegetation. The Corps' failure to look for that type of wetland in accordance with its own guidance renders the agency's no wetland finding arbitrary and capricious.

## V.     The Corps' Site Visit and Cardno Report are Insufficient to Support the Agency's No Wetland Finding

Both Defendants defend the Corps' reliance on the limited Cardno report and facts gathered from the agency's site visit. Corps Resp. Br. at 12-14, 19-20; NP Resp. Br. at 18-19. In particular, the Corps argues that "the NWI map reflected only one small area at the Site designated as possible wetland and reflected another with possible distinct vegetation" that when "independently

investigated by both Cardno and the Corps, were determined not to contain wetlands within the meaning of 33 C.F.R. § 328.3(b)." Corps Resp. Br. at 12. There are two problems with this.

First, as detailed in Plaintiffs' Opening brief, investigating only those two small areas was contrary to Corps guidance because: (a) they are the very locations of the Site *least likely* to contain wetlands (i.e., small hills that correspond to the few areas of the Site that are not mapped as having hydric soils by the soil survey); and (b) even routine wetland investigations of "areas greater than 5 acres" must include data collection along major water courses, and in sufficient number to adequately characterize the entire project site's hydrology, soils and vegetation—which for an 800-acre parcel would require significantly more than just two "data points." Pl. Brief at 24.

Even so, the Corps asserts that such "detailed delineations" are required only in "atypical situations." Corps Resp. Br. at 19. But that is categorically not so. The Corps' 1987 Manual sets forth procedures for conducting "*routine* determinations" on "areas greater than 5 acres in size" and those routine procedures, which Plaintiffs cite to in their Opening Brief, require far more than investigating two small data points on an 800-acre parcel. AR0164, 0170-0171. And, indeed, in all wetland determinations, even routine ones, the Corps is charged with obtaining information "sufficient for making a determination for the entire project area." AR0160-0161 (emphasis added).

Second, the Corps and Cardno conducted their limited field investigations *after* Natural Prairie had already engaged in land clearing—including clearing a "forested area" in one of the tiny spots investigated by Cardno (AR0059)—filled numerous ditches, and had installed an extensive drain tile system to build its CAFO. Accordingly, the fact that the Corps "inspected the Site firsthand, including areas other than in the NWI maps, and did not *observe* wetlands" (Corps Resp. Br. at 14) is not surprising. That observation also reveals nothing about what the Site's

conditions were *before* Natural Prairie altered them, or if farmed wetlands existed *before* the Site was cleared, filled and drained by Natural Prairie, which are the key questions here. *Supra* at 14-19.

Nonetheless, the Corps claims that focusing the investigation on those two small areas was reasonable because according to agency guidance "optimum use of NWI maps is to plan field review" and the "areas of possible wetlands [depicted on the maps] may be overinclusive." Corps Resp. Br. at 13. While that may generally be true, it is irrelevant. The Corps may not rely exclusively on NWI maps. *See e.g.,* AR0152 (advising that "NWI maps should not be used at the sole basis for determining whether wetland vegetation is present"). More critically, NWI maps <u>do not depict farmed wetlands</u>. *See* USFWS, National Wetlands Inventory website, *Data Limitations, Exclusions and Precautions* at https://www.fws.gov/wetlands/data/Limitations.html (cautioning that NWI maps "exclude certain types of 'farmed wetlands' as may be defined by the Food Security Act"); USFWS, *NWI Maps: What they Tell Us* at p. 9, Table 1:Examples of Major NWI Map Limitations at https://www.fws.gov/wetlands/Documents/NWI-Maps-What-They-Tell-Us.pdf (explaining that NWI maps exclude farmed wetlands except for "cranberry bogs, prairie potholes, pothole-like depressions, playa lakes and seasonally flooded diked former tidelands in California"). For these reasons, the limited Cardno report and the Corps' site visit observations, conducted after the Site was altered, and narrowly "tailored" based on a NWI map that is irrelevant in this setting, cannot rationally support the Corps' no wetlands finding.

**VI. The Corps Did Not Make an AJD Finding that the Lateral Ditches Natural Prairie Filled Lacked Relatively Permanent Flow and the Corps' After-the-Fact Argument That it Did is Not Supported by Substantial Evidence**

The Corps begins its argument against Plaintiffs' challenge to the AJD finding of non-jurisdictional irrigation canals by curiously asserting that "Plaintiffs' fall far short of showing that

the AJD lacked a rational basis to conclude that the lateral ditches, which the Corps *sometimes referred to as irrigation canals*, did not have relatively permanent flow." (Corps Resp. Br. at 20) But the Corps did not *sometimes refer* to the lateral ditches as irrigation canals. The Corps definitively determined in the AJD that "the irrigation canals do not meet the definition of an a(1)-a(6) water as defined in 33 CFR Part 328 and are not considered to be Waters of the U.S." AR0436; *see also* AR0435 (AJD finding that "irrigation canals in agricultural uplands" are "non-jurisdictional waters"). In other words, the Corps found that the lateral ditches are not jurisdictional *because* they are irrigation canals. Indeed, that is the very AJD finding that Plaintiffs are challenging in this case. Pl. Comp. at 26-27, 37. Yet tellingly, the Corps does not defend that finding anywhere in its brief.

The Corps' attempt to walk away from its own jurisdictional finding is understandable because it lacks any evidentiary support. As presented above, an *irrigation* ditch, according to Corps' guidance, "carries <u>only</u> irrigation water, irrigation return flows, and overland flow," whereas a *drainage* ditch "conveys water (other than irrigation related flows) from one place to another." AR0467-0468.  Natural Prairie's own documents confirm that the ditches it filled and replaced with drain tiles were not "shallow irrigation channels" but were several feet deep and drained groundwater. *Supra* at 7-8.  But even without Natural Prairie's documents, the Corps' irrigation canal finding is wholly unsupported by, and contrary to, record evidence.

Most notably, Natural Prairie made several statements to the Corps that confirm the laterals did not carry <u>only</u> irrigation water. In particular, Natural Prairie initially told the Corps that it was advised by the Newton County surveyor that the "all ditches on the property were private *drains*," and that "Natural Prairie acted to close those ditches and input *drainage* tile pattern in the interest of improving crop yield on the property." AR0016 (emphasis added). Later, during the Site visit,

Natural Prairie called the ditches "irrigation channels," but also said that that those "channels" were "enclosed" with "tile installed to *maintain* drainage." AR0072 (emphasis added). These statements are entirely inconsistent with the Corps' definition of an irrigation ditch. AR0467-0468. They are also inconsistent with the Corps technical guidance, which makes clear that if the ditches really were shallow irrigation ditches, Natural Prairie would have no need to replace them with a subsurface drainage system to *maintain* drainage of groundwater for "crop reasons." AR0360-0361, Fig. 47 ("[a]gricultural drainage systems use ditches, subsurface drainage lines or 'tiles,' and water-control structures to manipulate the water table and improve conditions for crops").

Furthermore, the AJD indicates that the Corps reviewed the "NRCS-USDA Web Soil Survey for Newton County." (AR0436) While only the soil maps for the Site's "project area" are included in the record (AR0100-0103), the entirety of that data is publicly available online.[14] Of significance, that soil data confirms that most of the soils at the Site are hydric and have wetness as a limiting factor in crop production and a high water table near or above the ground surface during planting season and for the first 2 to 3 months of the growing season. *See* USDA-NRCS Soil Survey of Newton County at Tables 2 and 18.[15] That means, growing crops at the Site would not have been possible without the drainage ditches that Natural Prairie filled. This is precisely why Natural Prairie had to replace those drainage ditches with a subsurface tile system to *maintain* that drainage. AR0016, 0072.

Abandoning its wholly unsupported "irrigation canal" finding, the Corps now tries to defend a new finding; that is, that the lateral ditches are not WOTUS because they did not have relatively permanent flow. Corps Resp. Br. at 20-21. Nowhere *in the AJD* can that finding be

---

[14] Searchable database by property at https://websoilsurvey.nrcs.usda.gov/app/WebSoilSurvey.aspx; and soil data for the county at https://www.nrcs.usda.gov/Internet/FSE_MANUSCRIPTS/indiana/IN111/0/newton.pdf

[15] https://www.nrcs.usda.gov/Internet/FSE_MANUSCRIPTS/indiana/IN111/0/newton.pdf. Notably, this soils data that the Corps said it considered is consistent with the 66 soil borings Natural Prairie conducted in 2017 and 2018.

found, and the AJD is the only document appealable and readily available to the public. *Supra* at fn. 7. Indeed, the section of the AJD that would otherwise indicate that the Corps had assessed the flow characteristics of the Site's ditches is left entirely blank. AR0431.

Plaintiffs' Opening Brief fully addresses the irrigation canal finding that the Corps *actually* made and detailed how the Corps' "observations" of non-existent lateral ditches did not suffice to make a determination that those ditches lacked relatively permanent flow. Pl. Brief at 15-18. While the agency may certainly respond to Plaintiffs' argument, it should not be able to present that response as a new rationale for an AJD finding it did not make. *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 958 (7th Cir. 2003) (an agency is not "allowed to defend its action with post-hoc arguments").

In any event, the Corps' new finding fares no better than its irrigation canal finding. As presented in Plaintiffs' Opening Brief, a non-navigable tributary that flows directly or indirectly to a traditional navigable water is jurisdictional if it has "relatively permanent flow," i.e., if it "typically (e.g., except due to drought) flow[s] year-round or … [has] a continuous flow at least seasonally (e.g., typically three months)." AR 0413-0414, fn 24. The Corps acknowledges this and insists that the evidence before it "did not document water in [the lateral] ditches, let alone continuous flow for three months" and "Plaintiffs' attempts to undermine this conclusion amount to a series of red herrings." Corps Resp. Br. at 21. One of those red herrings, according to the Corps, is "Plaintiffs' assert[ion] that the Corps simply looked at the filled ditches, said it could not observe water or identify an OHWM, and called it a day—but then decided to prepare a 'misleading' decision." Corps Resp. Br. at 22. While that characterization of Plaintiffs' argument is not entirely accurate (Pl. Brief at 16-17), the notion that the Corps prepared a misleading AJD based on observations it could not have made is not a red herring, it is what the evidence shows.

During the July 19, 2018 site visit, the Corps' Aaron Damrill had this to say about the lateral ditches that he knew had already been filled (AR0016):

> According to Mike and Will [DeJong] the Surveyor would not require approval for any *planned* work to the channels. . . According to Mike [IDEM] stated that the [Corps] had final say on jurisdiction. *I asked to see the channels* but Will [DeJong] stated that *most of the channels had already been enclosed* and tile installed to maintain drainage. Will said that *there was one section to the north that had not been enclosed yet*. We looked at the channel and it was shallow, but did have a bed and bank, but no other OHWM indicators. The channel was predominately vegetated and no water was observed in the channel. . . *Will stated that the channels already enclosed were shallower than this one and comprised predominately of grass. . .*

AR0072 (emphasis added). Then, providing his analysis in support of the AJD, Mr. Damrill identifies the "laterals/canals *that connect to* . . . Bogus Island and Lawler Ditches" as "potential waters *on the project site* that were considered to be Waters of the U.S."; but then concludes they are not WOTUS because during the Site visit "no water *was observed* in the channels and no Ordinary High Water Mark *could be identified*" and they "*were not draining* a wetland or other aquatic resource." AR0422 (emphasis added). Similarly, the AJD is written as if the laterals still exist:

> The project area *has* irrigation canals that were mapped on the NHD Maps. . . No water *was observed* in the irrigation canals nor was an Ordinary High Water Mark indicator described in RGL 05-05 *identified* during the July 19, 2018 site visit. The irrigation canals do not meet the definition of an a(1)-a(6) water as defined in 33 CFR Part 328 and are not considered to be Waters of the United States."

AR0436 (emphasis added).

Nothing in these AJD findings would alert the reader to the fact that the lateral ditches had already been filled and tiled. And, other than castigating Plaintiffs for pointing that out, nowhere in their briefs do the Defendants explain why the AJD—the only document readily available to the

public—is written as if the lateral ditches still exist.[16] Such a misleading, unsupported finding reflects the agency's arbitrary and capricious decision-making here.

Finally, the Corps argues that the record "amply support[s] the [agency's] conclusion that these lateral ditches did not have relatively permanent flow." Corps Resp. Br. at 20. That evidence, according to the Corps, includes: (a) the agency's inspection of "an existing physical point of reference at the Site—an unenclosed ditch—as evidence of the *likely* characteristics of the enclosed lateral ditches[;]" (b) the Corps' observation that "[t]his unenclosed ditch had a bed and bank, but it was shallow, contained no water, and had no other indicators of an OHWM," which "*suggested* the unenclosed ditches similarly lacked relatively permanent flow[;]" (c) aerial photographs, which showed water in Bogus Island and Lawler Ditches but not the laterals; and (d) the soil survey map and USGS map that, according to the Corps, do not depict the laterals as streams or rivers. Corps Resp. Br. at 20-21 (emphasis added). But this description of evidence on which the Corps claims it relied simply confirms that the Corps did not follow its own guidance for assessing whether the filled laterals had relatively permanent flow.

As an initial matter, to make a flow determination, Corps guidance directs evaluating the "flow characteristics" of the ditch at its "farthest downstream limit" where it "enters a higher order stream." AR 0413, fn 24. Thus, looking at some unidentified "physical point of reference" of some other unidentified ditch clearly does not meet this requirement. Moreover, the "flow characteristics" to be evaluated include ditch size (width, depth, side slopes), gradient, flow source (groundwater, surface water), flow duration and volume, bed and bank, and ordinary high water

---

[16] Nor do Defendants provide any explanation for the material inconsistencies between the Corps' AJD finding that Bogus Island Ditch is a "county regulated *drain*" with "relatively permanent flow" and a WOTUS (AR0423, 0434), and its post-AJD decision that Bogus Island Ditch is either exempt because it "only moves *irrigation* water" (AR0474) or is not a WOTUS at all (AR0475). Such inconsistent pronouncements reflect the agency's arbitrary and capricious decision-making here and should not be rubber-stamped by this Court.

mark ("OHWM") indicators. AR 0430-0431. Again, finding no water or OHWM in some other unidentified ditch says nothing about the flow characteristics of the numerous lateral ditches that no longer exist, much less "suggest" that those filled ditches lacked relatively permanent flow.

Finally, in assessing OHWM indicators, the Corps is to "rely on physical evidence" to the extent such "evidence can be found and . . . is deemed reasonably reliable." Exh. 19 (RGL No. 05-05 at 2).[17]  Given that the lateral ditches were filled, there was no physical evidence to consider, and the Corps has provided no rational explanation for how looking at some unidentified "physical point of reference" of some other unidentified ditch is not "reasonably reliable" physical evidence. That leaves the aerial photographs, and the soil survey and USGS maps (AR0085-0104), none of which reasonably support the Corps' view.

The Corps declares that the aerial photos show water in Bogus Island and Lawler ditches, but not the lateral ditches. Corps Resp. Br. at 21. However, the Corps offers no explanation as how it arrived at that conclusion and in looking at the aerials, there is nothing materially different about the observable features (width, color, darkness, etc…) in any of the ditches depicted. In fact, they all appear to have water (or not) at the same time, especially in the more recent, higher resolution photos. *See e.g.* AR0090-0097. While the Corps is correct that courts are to be "most deferential when an agency is making predictions within its area of special expertise, [or] at the frontiers of science" (Corps Resp. Br. at 44), there is nothing particularly special or highly technical about looking at photos of ditches to see if they have water in them. Moreover, judges are not required to leave their life experiences and common sense at the door. *See e.g., Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004).

---

[17] The Corps contends that Plaintiffs are misconstruing RGL 05-05 and conflating the terms "flow" and "OHWM" as interchangeable or synonymous. Corps Resp. Br. at 21. That is not so. Plaintiffs Opening Brief makes clear that OHWM is <u>but one</u> of the flow indicators that the Corps is to assess when evaluating whether a water has relatively permanent flow and that the Corps did not follow applicable guidance (RGL 05-05) for doing so. Pl. Brief at 16.

Finally, the Corps claims that the soil and USGS maps designate Bogus Island and Lawler Ditches as streams or canals, while the laterals are not similarly designated. Corps Resp. Br. at 21 (citing to AR0099, 101-0102, 0104). That is simply not so. The USGS map depicts all of the ditches at the Site, Bogus Island and Lawler included, as "CanalDitch[es]" as denoted by the yellow lines (AR0099)—no difference there. The topographic map simply confirms that the lateral ditches once existed and that ground surface elevations at the Site are essentially the same as the surrounding area, i.e. flat. AR0104. The soil maps similarly say nothing about the flow characteristics of the ditches. AR0100-0101. Thus, there is simply no evidence to support the Corps' finding that the lateral ditches lacked relatively permanent flow.

To the contrary, the soil survey data along with Natural Prairie's soil tests and ditch survey—all of which were readily available to the agency—conclusively show that the vast majority of soils at the Site are hydric, have a high water table near or above the ground surface most of the year, and that the lateral ditches were 6-9 feet deep and, therefore, sat within and drained that water table. *See supra* at 7, 24. Put another way, those ditches flowed most of the year and were cut through wetlands. Had the Corps followed its technical guidance, and considered all relevant factors, it would have necessarily obtained this readily available information. It did not and the Court is not required to rubber-stamp the Corps' arbitrary, capricious and unsupported decision making.

## VII.   The Corps Cannot Ignore its Own Guidance

Throughout its brief and in the administrative record, the Corps relies on its guidance documents to support its position (*see e.g.* Corps Resp. Br. at 4, 5,13, 18, 24; AR0436), but then appears to condemn Plaintiffs for doing the same. Corps Resp. Br. at 24 ("Plaintiffs are mistaken in treating these guidance documents as if they are binding legal norms or have the force of law.")

The Corps cannot have it both ways. While Plaintiffs agree that Corps guidance "does not carry the force of law,"—and have not relied on it as such—the Corps cannot deviate from its guidance without providing reasoned grounds for doing so. *Precon Dev. Corp. v. United States Army Corps of Eng'rs*, 633 F.3d 278, 292 (4th Cir. 2011). Furthermore, the Corps' 1987 Manual and Midwest Supplement that provide the relevant guidance for assessing farmed wetlands on agricultural land, is the very guidance that the Corps includes in its administrative record as supporting the AJD. And that guidance <u>is</u> mandatory on the Corps. *New Hope Power Co. v. United States Army Corps of Eng'rs*, 746 F. Supp. 2d 1272, 1275 (S.D. Fla. 2010); *see also* 58 FR 4995, 4995 ("U.S. Army Corps of Engineers (Corps) and EPA will adhere to the 1987 Corps of Engineers Wetlands Delineation Manual . . . in making their determinations of the geographic scope of waters of the United States under section 404 of the Clean Water Act.")

**Conclusion**

For all the foregoing reasons, the Corps' AJD findings that Natural Prairie's project site contains non-jurisdictional irrigation canals and no wetlands should be vacated by this Court.

Respectfully submitted,

/s/ Kim E. Ferraro
Kim E. Ferraro (#27102-64)
Hoosier Environmental Council
3951 N. Meridian, Suite 100
Indianapolis, IN 46208
kferraro@hecweb.org

Jeffrey B. Hyman (#24625-89)
Conservation Law Center
116 South Indiana Avenue, Suite 4
Bloomington, IN 47408
jbhyman@indiana.edu

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 14, 2020, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Kim E. Ferraro              

| | |
|---|---|
| Benjamin R. Carlisle | Bradley R. Sugarman |
| Wayne T. Ault | Andrew M. McNeil |
| Teresa Dillner | Daniel P. McInerny |
| U.S. Department of Justice | BOSE MCKINNEY & EVANS LLP |
| Envtl. & Natural Res. Def. Section | 111 Monument Circle, Suite 2700 |
| P.O. Box 7611 | Indianapolis, IN 46204 |
| Washington, D.C. 20009 | BSugarman@boselaw.com |
| benjamin.carlisle@usdoj.gov | AMcNeil@boselaw.com |
| wayne.ault@usdoj.gov | DMcInerny@boselaw.com |
| Teresa.dillner@usdoj.gov | |