UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

HOOSIER ENVIRONMENTAL COUNCIL
*et al.*,

                Plaintiffs,

      v.

NATURAL PRAIRIE INDIANA
FARMLAND HOLDINGS, LLC *et al.*,

            Defendants.

CAUSE NO. 4:19-CV-71 DRL-JEM

OPINION & ORDER

This case concerns a dairy farm. Natural Prairie Indiana Farmland Holdings, LLC purchased

land in Newton County, Indiana to build and operate a concentrated animal feeding operation

(CAFO) with over 4,350 dairy cows. The Army Corps of Engineers inspected the property and

concluded that much of the land was not subject to the Clean Water Act. Two environmental advocacy

organizations, the Hoosier Environmental Council (HEC) and Indiana Audubon Society (IAS), sued

alleging that Natural Prairie violated the Clean Water Act and that the Army Corps of Engineers'

administrative jurisdictional determination violated the Administrative Procedures Act. Because the

administrative record fails to show the agency considered relevant factors, the court finds the

determination arbitrary and capricious and remands for further consideration.

BACKGROUND

By way of brief background, the land Natural Prairie purchased to construct its CAFO is

unique. It is the former lakebed of Beaver Lake. The lake was drained in the early 1900s—then the

largest natural lake in the State of Indiana—to make way for farmland. Beaver Lake was part of Grand

Kankakee Marsh, once the country's largest inland wetland. Called the "Everglades of the North," the

Grand Kankakee Marsh stretched almost a million acres across Northern Indiana and Illinois.

To drain Beaver Lake, engineers constructed several large ditches and drainage canals to move the water from the lake into the nearby Kankakee River, a "water of the United States" subject to various environmental regulations. Two of the drainage ditches—the Lawler Ditch and the Bogus Island Ditch (along with several smaller lateral ditches)—sit on Natural Prairie's land.

As alleged, without informing the government, Natural Prairie filled nearly half a mile of the Bogus Island Ditch and installed drainage "tiles," or underground pipes used to drain excess water from the soil. Natural Prairie filled and tiled various lateral ditches attached or near to the Lawler and Bogus Island Ditches. After these alterations, Natural Prairie contacted the Army Corps of Engineers to determine if the ditches, lateral ditches, and the land was subject to federal regulation. After a site visit, the Corps concluded the land was not a jurisdictional wetland, and that only the Lawler and Bogus Island Ditches were jurisdictional waters and under its regulatory control.

An environmental group has restored more than 7,000 acres of nearby wetlands and prairies at Kankakee Sands, a wetland preserve that boarders Natural Prairie's land. In addition to native flora and fauna (including a herd of buffalo), approximately 87 rare, threatened, or endangered species reportedly call the Kankakee Sands home.[1]

In July 2019, HEC and IAS (and certain nearby residents) sued the Corps and Natural Prairie. Under the Administrative Procedures Act (APA), the associations seek judicial review of the Corps' determination that the land is not a wetland and the lateral ditches are not jurisdictional waters. The associations also claim that Natural Prairie's filling and tiling of ditches without a permit, as well as altering a jurisdictional wetland without a permit, violated the Clean Water Act (CWA). *See* 33 U.S.C. §§ 1344 (permits for dredged or fill material), 1311(a) (prohibition of discharging a pollutant).

---

[1] *Efroymson Restoration at Kankakee Sands,* The Nature Conservancy, https://www.nature.org/en-us/get-involved/how-to-help/places-we-protect/kankakee-sands/.

The magistrate judge bifurcated the case so that the APA claim could be addressed through discovery and summary judgment before proceeding with discovery on the CWA claim. After filing of several motions, including a motion to dismiss the CWA claim and crossmotions for summary judgment, the case was reassigned to this presiding judge earlier this year. Today the court rules on all pending motions, doing so in two opinions.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must deny summary judgment when there is admissible evidence that creates a genuine issue of material fact—a triable issue. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011). The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

To overcome summary judgment, a party must set forth by affidavit or other evidence "specific facts" that "for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); Fed. R. Civ. P. 56(c)(4), (e).[2] The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that

---

[2] Natural Prairie argues in reply that it is somehow prejudiced by the affidavits the associations submitted to oppose summary judgment. The court sees no prejudice in HEC and IAS following the rules. Natural Prairie calls the affidavits "untimely and unduly prejudicial," but never explains why. The court won't guess at the point. *See Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)); *United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In a case involving crossmotions for summary judgment, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

A.      *The Court Denies Natural Prairie's Summary Judgment Motion.*

Natural Prairie argues that the associations lack both Article III and statutory standing. The associations contest this assertion. Apart from joining Natural Prairie's motion, the Corps filed a response disagreeing with certain of the arguments advanced in Natural Prairie's motion related to administrative standing. The court takes up these standing arguments in turn.

1.      *The Associations Have Article III Standing to Sue the Corps for Violation of the Administrative Procedures Act.*

Natural Prairie argues that HEC and IAS lack constitutional standing because they aren't adversely affected by the Corps' approved jurisdictional determination. Natural Prairie claims that the agency's decision never impacted the HEC, IAS, or their properties. In short, the Corps' decision only impacted the farm, not the surrounding land.

The court must ensure its jurisdiction. *See Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019); *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017). The United States Constitution confines the federal judiciary's power to "Cases" and "Controversies." U.S. Const. art. III § 2. For a case or controversy to exist, a plaintiff must have standing—an injury, fairly traceable to the defendant's conduct, that the court's decision will likely redress. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

A plaintiff must have an actual stake in the dispute. *See Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1181 (7th Cir. 2020). Without an actual stake, a court order is nothing more than legal advice— an advisory opinion that lawyers, not judges, are paid to give. *See id.* The plaintiff's injury must be

4

"concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S 167, 180-81 (2000) (quoting *Lujan*, 504 U.S. at 560-61). An association of members (such as HEC or IAS) has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181 (citation omitted).

No one seriously contests the last two requirements. HEC and IAS are both Indiana environmental advocacy and conservation organizations whose members regularly use the Kankakee River areas, including downstream from the CAFO site. These organizations are devoted to protecting Indiana's waterways, wildlife, and wildlife habitat. The suit's subject matter pertains to these organizational *raisons d'être. See Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 607 (7th Cir. 1993) (need only show "an organization's litigation goals [are] pertinent to its special expertise and the grounds that bring its membership together"). And neither the claim nor requested relief require the indispensable participation of individual members, *see Hunt v. Wash. St. Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), particularly when declaratory or injunctive relief will inure to their benefit without individualized proof of damages, *see Retired Chi. Police*, 7 F.3d at 603. The dispute really centers on the first requirement—whether members of these organizations would have standing.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *See Friends of the Earth*, 528 U.S at 183 (quotation omitted). Injury in fact can be satisfied by an existing injury or an imminent threat of a future injury. *Hunt*, 432 U.S. at 342. For Article III standing, the injury analysis focuses on the person bringing suit without being limited to an injury to the environment of the offending site. *See Friends of the Earth*, 528 U.S at 181

(finding injury in fact under Article III when a plaintiff no longer could enjoy recreational activities several miles downriver from a water treatment plant).

HEC and IAS sue for those citizen-members who live near the site and regularly use and enjoy the Kankakee River and its tributaries, wetlands, and surrounding natural areas that are downstream from the CAFO site, including the adjacent Kankakee Sands. They use these areas for recreational, scientific, aesthetic, spiritual, and conservation purposes, including swimming, picnicking, hiking, camping, kayaking, and viewing and enjoying wildlife and aquatic life. At least three members get their water from private wells downgradient of the site. Six sworn affidavits confirm their use and enjoyment of the Kankakee Sands [ECF 66].[3]

Based on their history, the citizen-members also say they plan to use this reserve in the future. They remain concerned that the manipulation of hydrology and drainage at the CAFO site will degrade these nature and wildlife areas and waters and diminish their ability to continue using and enjoying them. This isn't a passing fear. An Indiana wetland scientist and drainage expert opines that the Corps' decision and Natural Prairie's continued hydrological changes to the property will result in "a loss of stream and wetland functions on Natural Prairie's property that will alter hydrology and water quality downstream within Kankakee Sands" [ECF 66-1 ¶ 7]. She says such alteration "will have a significant and negative impact on the sensitive habitats restored at Kankakee Sands, and the rare plants and animals that rely on those habitats" [*id.*]. "[P]lants and animals that cannot tolerate disturbance and will cease to utilize the area" [*id.*].

Natural Prairie nevertheless argues that the associations lack standing because the injury relates to the Kankakee Sands—property adjacent to the farm, but not the farm. Its focus on the farmland alone seems myopic under the law. Natural Prairie relies on *Lujan v. National Wildlife Federation*, 497

---

[3] *See* ECF 66 Ex. 3 Thomas Vanes (resident member of HEC); Ex. 4 Alyssa Nyberg (resident member of HEC); Ex. 5 Gustaf Nyberg (resident member of HEC); Ex. 6 Barbara Lucas (resident member of IAS); Ex. 8 Debora Cutts (resident); & Ex. 9 Thomas Cutts (resident).

U.S. 871, 888-89 (1990). There an environmental group submitted an affidavit at summary judgment from its citizen-member claiming that his use and enjoyment of federal lands "in the vicinity" of South Pass-Green Mountain, Wyoming would be adversely affected by a decision by the Bureau of Land Management to open 4,500 acres (within a 2-million-acre area) for mining activities. *Id.* at 886-87. This statement was altogether non-specific. *See id.* at 888-89. The Supreme Court held that a wildlife group must do more than state that "one of [its] members use[d] unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." *Id.* at 889.

Natural Prairie reads too much into this decision by arguing that the injury must occur to the contested property, not to a site adjacent to it. The decision echoes the requirements of standing—that the injury be not just concrete but particularized. In addition, the decision rests on Rule 56(e)'s requirement that affidavits state "specific facts" to oppose summary judgment. *See id.* Point of fact, in *Friends of the Earth,* 528 U.S. at 183-85, an environmental group established standing when a wastewater treatment facility affected the recreational use of a river several miles downstream. Affiants explained that the facility's discharges created "reasonable concerns" and "directly affected [their] recreational, aesthetic, and economic interests," despite exercising these interests miles away from the plant. *Id.* at 183-84. Distinguishing this outcome from *Lujan*, the court noted that the submissions in *Friends of the Earth* presented "dispositively more than the mere general averments and conclusory allegations [previously] found inadequate." *Id.* at 184.

This case does too. Affidavits present specific facts, supported by expert testimony, that suffice. In doing so, HEC and IAS fall squarely within the examples of third-parties who likewise have secured standing, *see id.* at 183, including under the APA, *see, e.g., Bennett v. Spear*, 520 U.S. 154, 167-68, 179 (1997); *Sauk Prairie Conservation Alliance v. U.S. Dept. of Interior*, 944 F.3d 664, 670 (7th Cir. 2019); *cf. Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (organization may have standing to challenge the

lessened aesthetic and recreational value of a nearby area, though only those who use the property). Natural Prairie's offer of the *NAHB* saga for a contrary view is astigmatic. *See Nat'l Assoc. of Home Builders v. EPA*, 731 F. Supp.2d 50 (D.D.C. 2010), *aff'd* 667 F.3d 6 (D.C. Cir. 2011); *Nat'l Assoc. of Home Builders v. EPA*, 956 F. Supp.2d 198 (D.D.C. 2013), *aff'd* 786 F.3d 34 (D.C. Cir. 2015).

The associations must also show that this injury to its citizen-members is "fairly traceable" to the defendant's actions. *See Friends of the Earth*, 528 U.S at 181-82. Whether an injury is fairly traceable to the alleged harm requires a "relatively modest" showing, *Bennett*, 520 U.S. at 171, less than proximate cause, *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

"When a plaintiff's asserted injury arises from the government's failure to regulate someone other than the plaintiff, causation ordinarily hinges on the response of the regulable third party to the government inaction." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 500-01 (7th Cir. 2005) (internal quotations and alterations omitted). Thus, the test is not whether injury to a property alone can be fairly traceable to the defendant's actions or the alleged injury occurred within the physical boundaries of the defendant's property, as Natural Prairie argues, but instead whether the injury to the person is fairly traceable to the agency's and landowner's actions. *See Friends of the Earth*, 528 U.S at 181-82.

A wetland and erosion scientist directly attributes the consequence of the Corps' decision, and the prior and ongoing actions by Natural Prairie, to "a loss of stream and wetland functions on Natural Prairie's property that will alter hydrology and water quality downstream within Kankakee Sands" [ECF 66-1 ¶ 7]. This alteration, the associations' scientist concludes, "will have a significant and negative impact on the sensitive habitats restored at Kankakee Sands, and the rare plants and animals that rely on those habitats—plants and animals that cannot tolerate disturbance and will cease to utilize the area" [*id.*]. The citizens' injury, as attested in their sworn statements, relates to a lessening of their recreational, aesthetic, ecological, and scientific uses of the surrounding area—a use, the associations

show through their scientist, that will be significantly diminished, if not eliminated, because of the actions of the Corps and Natural Prairie. The associations have has met the relatively modest showing that the injury today can be fairly traced to the government's jurisdictional determination, and its impact on Natural Prairie's actions. *See Bennett*, 520 U.S. at 171; *Lujan*, 504 U.S. at 561-62.

Finally, the associations must show that a decision will redress their citizen-members' injury. They "need not show that a favorable decision will relieve [their] every injury." *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (citation omitted). Rather, they simply need to show "that a favorable decision will relieve a discrete injury to [them]." *Id.* "[A]s long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress . . . the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." *Am. Bottom Conservancy v. U.S. Army Corps. of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011) (if an environmental group concerned about pollution knocks out a Corps permit to build a site that will pollute, the injury is redressable).

HEC and IAS argue that redressability is satisfied because knocking out the Corps' jurisdictional determination will incentivize Natural Prairie to avoid or mitigate the effect of filling and draining these waters, thereby limiting the impact on the downstream hydrology and the citizen-members' recreational and aesthetic use and enjoyment of the land. They say a decision to vacate the jurisdictional decision will reduce the risk that Natural Prairie will undertake those otherwise unlawful activities.

Though this outcome is one possibility, and perhaps far from certain, this doesn't defeat standing. *See id.* Should a jurisdictional decision be reexamined by the Corps, and subsequently changed, Natural Prairie's actions on the land would be subject to various regulatory requirements designed, in part, to limit its impact on other ecological and hydrologic features. This nonnegligible possibility of redress is sufficient for standing. *See id.* Article III standing thus exists. The court has

subject matter jurisdiction so long as one plaintiff has standing. *See Horne v. Flores*, 557 U.S. 433, 446 (2009).

2.      *The Associations Have Statutory Standing to Challenge the Corps' Decision.*

To seek judicial review of administrative actions under the APA, the associations must show that they has been "adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. They must demonstrate an injury in fact and that they have an interest within the "zone-of-interests" protected by the relevant statute. *See Lujan*, 497 U.S. at 883; *see generally Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("That interest, at times, may reflect aesthetic, conservational, and recreational as well as economic values.") (quotations omitted). Even when constitutional standing exists, the prudential zone-of-interest test must be satisfied. *Am. Fed'n of Gov't Emps., Loc. 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999). This requirement is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.* at 468 (citation omitted).

"In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400 (1987); *see also Am. Fed'n*, 171 F.3d at 469. Nevertheless, it is not a test that is intended to be "particularly demanding." *Clarke*, 479 U.S. at 400 (noting that "there need be no indication of congressional purpose to benefit the would-be plaintiff"). To assess the zone of interest, a court must "first discern the interests arguably . . .  to be protected by the statutory provision at issue . . . then inquire whether the plaintiff's interests affected by the agency action in question are among them." *Am. Fed'n*, 171 F.3d at 469.

Congress's stated intention by passing the CWA was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One method for

achieving this goal is requiring permits for "the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). A jurisdictional wetland is considered part of the country's waters. 33 C.F.R. § 328.3(a)(4).

Comparing this congressional intention with the basis of this suit, the complaint aims to challenge the procedural foundation of the Corps' jurisdictional decision—thus to prevent continued and future alterations to the hydrology of the site draining "into jurisdictional waters that impact neighboring wetlands, nature areas, and wildlife habitat" [ECF 66 at 15]. The consequence of Natural Prairie's hydrologic alterations, according to the associations, is a "significant and negative impact on the sensitive habitats restored at Kankakee Sands" leading to "the rare plants and animals that rely on those habitats . . . ceas[ing] to utilize the area" and injuring the citizens who enjoy these features [ECF 66-1 ¶ 7]. This protectionist goal falls within the statute's stated purpose of maintaining "the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and the statutory provision's purpose to regulate discharge into the Nation's navigable waters, 33 U.S.C. § 1344(a), so this suit falls within the statute's zone of interest. The associations thus have statutory standing.

3.     *The Corps' Administrative Jurisdictional Decision is a Reviewable Final Administrative Action.*

Natural Prairie next argues that the associations are prohibited from seeking judicial review of the jurisdictional decision because it wasn't a final administrative action as to them. The associations— now joined by the Corps on this point—explain that the operative question is the action's finality.

For an agency's action to be judicially reviewable, it must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature[—but] must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (citing *Bennett*, 520 U.S. at 177-78). An administrative jurisdictional determination is a final agency action. 33 C.F.R. § 320.1(a)(6) ("A determination pursuant to this authorization shall constitute a Corps final agency

action."). A negative jurisdictional determination—when the Corps declines jurisdiction, as occurred

here—likewise is a final agency action precisely because legal consequences flow from it. *See Hawkes*,

136 S. Ct. at 1814 (negative jurisdictional determinations carry legal consequences). For example, a

negative jurisdictional determination binds the government to the position that no jurisdictional waters

are present for five years. *Id.*

Natural Prairie acknowledges that a jurisdictional decision is a final agency action, but

nonetheless argues that it is the only party who could seek judicial review. To the extent that Natural

Prairie argues that a third-party lacks standing to bring a claim under the APA, it is wrong. *See Friends

of the Earth*, 528 U.S at 183 (association had standing to sue under the APA based on pollution by a

regulated entity); *Bennett*, 520 U.S. at 177-179 (third-parties impacted by agency action have standing

to bring an APA claim); *Lujan*, 497 U.S. at 885 (third-party organization has standing to sue under

APA if citizen-members establish an injury in fact); *see also Sauk Prairie*, 994 F.3d at 670 (finding

standing for a conservation group to sue the Department of Interior for decisions made about a

Wisconsin state park).

To the extent Natural Prairie argues that the legal consequences of a final agency action must

be borne by the plaintiff, it is also wrong. The existence of a legal consequence is the relevant inquiry

for third-party APA claims, not who bears them. *See, e.g.*, *Bennett*, 520 U.S. at 177-78 (third-party

irrigation districts and ranchers could bring a claim even when the legal consequences of an

administrative action were borne by a different government agency). The Corps' decision is a final and

reviewable agency decision.

4.      *The Associations Aren't Precluded from Suing Because of a Failure to Exhaust
        Administrative Remedies.*

Next, Natural Prairie argues that the associations failed to exhaust alternative regulatory and

(argued in reply) judicial remedies. The associations—once more joined by the Corps—argue that the

statutory requirement to exhaust administrative remedies before seeking judicial review only binds an applicant, not third-parties.

"No affected party may file a legal action in the Federal courts based on a permit denial or a proffered permit until after a final Corps decision has been made and the appellant has exhausted all applicable administrative remedies under this part." 33 C.F.R. § 331.12(a). The regulations define "affected party" as "a permit applicant, landowner, a lease, easement or option holder (*i.e.,* an individual who has an identifiable and substantial legal interest in the property) who has received an approved [jurisdiction determination], permit denial, or has declined a proffered individual permit." 33 C.F.R. § 331.2.

First, the plain text of this exhaustion provision obligates administrative review by the affected applicant only when the agency finds jurisdiction and denies a permit (or proffer). 33 C.F.R. § 331.12(a). Those aren't the circumstances here. Second, the plain text requires exhaustion by a defined applicant, but the associations fall outside that definition. They own no land. They have no real property interest in the site. They never applied for a jurisdictional determination. No one argues that this definitional regulation isn't a fair exercise of authority.

To sidestep this plain reading, Natural Prairie argues in reply that the associations also cannot sue under the APA because they have a remedy under the CWA. Arguments first made or developed in reply are waived. *See Wonsey v. City of Chi.*, 940 F.3d 394, 398 (7th Cir. 2019). The merits dispose of this argument too.

An agency action is only reviewable when it is final and "there is no other adequate remedy in a court." 5 U.S.C. § 704. This latter limitation "has been almost completely ignored in judicial opinions." *Bowen v. Massachusetts*, 487 U.S. 876, 902 (1988). Nevertheless, "the provision as enacted . . . makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Id.* at 903; *see also Bennett*, 520 U.S. at 175 (ability to bring an

APA claim against the government for failure to undertake administrative duties was dependent on the outcome of a citizen suit against the agency head for the same claim). This limitation precludes judicial review of an agency's action only when another mechanism exists to review it. *See Bowen*, 487 U.S. at 903. A CWA claim doesn't preclude judicial review under the APA. *See Sackett v. EPA*, 566 U.S. 120, 131 (2012). Failure to exhaust isn't a defense here. For all these reasons, the court denies Natural Prairie's summary judgment motion.

B.   *The Corps' Administrative Jurisdiction Determination was Arbitrary and Capricious.*

The court turns to the main event: review of the Corps' decision that the drainage tributaries and the wetland-like areas of the farm weren't jurisdictional waters. The associations argue that the Corp's determination was arbitrary and capricious. The Corps responds, and cross-moves, that its review was adequate and in accordance with the law. Natural Prairie joins the Corps' crossmotion.

1.   *The Administrative Procedures Act Governs the Court's Review.*

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dept. of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). "It requires agencies to engage in reasoned decision making." *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

Under the APA, a court may set aside an agency action or conclusion when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); *see also Rapanos v. United States*, 547 U.S. 715, 786 (2006) (Kennedy, J., concurring); *Orchard Hill Building Co. v. United States Army Corps of Engineers*, 893 F.3d 1017, 1021 (7th Cir. 2018) (Justice Kennedy's concurrence controls). An agency's determination is arbitrary and capricious if it relied on factors Congress did not intend it to consider, offers explanations for its actions that "run counter to the evidence before the agency," makes a determination that "is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise," or entirely failed to consider relevant factors. *Zero Zone, Inc. v. U.S. Dept. of Energy*, 832 F.3d 654, 668 (7th Cir. 2016); *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

A court's scope of review is "narrow and a court must not substitute its judgment for that of the agency." *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 547 (7th Cir. 2012). It must "review the entire record and, even if [it] disagree[s] with an agency's action, [it must] uphold the action if the agency considered all of the relevant factors and [the court] can discern a rational basis for the agency's choice." *Boucher v. U.S. Dept. of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019) (quotations omitted). That said, narrow does not mean "toothless." *Pioneer Trail Wind Farm, LLC v. Fed. Energy Regul. Comm'n*, 798 F.3d 603, 608 (7th Cir. 2015). "The APA requires meaningful review." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). A "reviewing court should not attempt . . . to make up" for deficiencies or holes in an agency's reasoning and should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Zero Zone*, 832 F.3d at 668.

Instead, a court should conduct a meaningful review of the agency's work and not "rubber-stamp" conclusions merely because they are the product of the agency's deliberative process. *Orchard Hill*, 893 F.3d at 1024; *see also Dickinson*, 527 U.S. at 162. When "the Corps base[s] its conclusions on evidence [that is] so inadequate and misleading," the court's review should be scrutinous. *Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986) (assessing a permit approved under the National Environmental Protection Act). "If the Corps bases its conclusions on entirely false premises or information, even when its attention is specifically directed to possible defects in its information, [a reviewing court] would have difficulty describing its conclusions as reasoned; [it] would have to call them arbitrary and capricious." *Id.* (citing *Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1035 (2d Cir. 1983) ("A decision made in reliance on false information, developed without an effort in objective good faith to obtain accurate information, cannot be accepted as a 'reasoned' decision.")).

2.      *The Clean Water Act Federally Regulates United States Waters.*

There is a lot of water in the United States. Through extensive industrialization and growth, some of that water has become polluted. To respond to these concerns, Congress passed the CWA in 1972. The CWA's purpose was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the CWA prohibits "the discharge of any pollutant by any person" without a permit. 33 U.S.C. § 1311(a). The term "pollutant" is broadly defined to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

"The Secretary of the Army, acting through the Chief of Engineers of the Army Corps of Engineers, may issue permits for discharge of dredged or fill material into the navigable waters at specified disposal sites." *Rapanos*, 547 U.S. at 760. Navigable waters are defined under the act as "waters of the United States." 33 U.S.C. § 1362(7). The Corps further defines waters of the United States to include "[w]etlands adjacent to waters" and "[t]ributaries of waters," but not "prior converted cropland." 33 C.F.R. §§ 328.3(a)(5), (7)-(8) (1986).[4]

If a party wants to build, dredge, fill, or otherwise alter water on its property, it is prudent to determine first whether the water is regulated (that is, jurisdictional). When a party seeks a jurisdictional determination, the Corps dispatches its "district engineers to issue formal determinations concerning the applicability of the Clean Water Act . . . to activities or tracts of land and the applicability of general permits or statutory exemptions to proposed activities." 33 C.F.R. § 320.1(a)(6).

---

[4] The Clean Water Rule was amended in 2015, but its implementation was enjoined in Indiana at the time of Natural Prairie's jurisdictional determination. Congressional Reporting Service, *"Waters of the United States" (WOTUS): Current Status of the 2015 Clean Water Rule* 6 (Dec. 12, 2018). Therefore, the pre-2015 rule and definitions govern this suit.

Part of this assessment decides whether waters of the United States exist on the property, thereby subjecting the waters to the CWA and conferring regulatory jurisdiction on the Corps. 33 C.F.R. § 325.9. "A determination pursuant to this authorization shall constitute a Corps final agency action." 33 C.F.R. § 320.1(a)(6). If jurisdiction is found, then the party must seek a permit or face potential criminal and civil liability. *See Rapanos*, 547 U.S. at 760 ("Discharge of pollutants without an appropriate permit may result in civil or criminal liability.").

The associations argue that the Corps' wetland determination was arbitrary and capricious because the agency made this conclusion without relying on the relevant factors for former agricultural land as articulated in the Corps' technical guidance manuals. The Corps responds that its guidance's procedures weren't applicable and that its administrative record supports its decision. Natural Prairie likewise argues that the finding was supported by substantial evidence.

3.      *The Wetland Guidance Manuals Bind the Agency.*

The Corps makes a wetland finding based on a technical and data-driven process in which the Corps assesses and characterizes wetlands beyond the statutes and regulations. Specifically, the Corps relies on the *Corps of Engineers Wetlands Delineation Manual* (1987) [R. 105] and the *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Midwest Region (Version 2.0)* (Aug. 2010) [R. 248]. These manuals provide detailed explanations and procedures for the agency to follow when making a wetland determination and contain a comprehensive, though not exclusive, repository of relevant factors. When the two manuals recommend different courses of action, such as guidance for difficult and problematic areas, the supplement takes precedence [R. 261].

The parties argue about whether these guidance manuals bind the Corps. As technical guidance, the manuals don't carry the force of law. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). But the law considers adherence to them mandatory when making a wetland determination. Congress has said so. *See* Energy and Water Development Appropriations Act of 1993, Pub. L. 102-

377, 106 Stat 1315 (to identify or delineate the waters of the United States, "the Corps of Engineers will continue to use the Corps of Engineers 1987 Manual"). This circuit has said so. *See Boucher*, 934 F.3d at 535 (regulators "have guidance they can and should follow"). The Corps has said so. *See Memorandum from the Army Corps of Engineers on the Implementation of the 1987 Corps Wetland Delineation Manual* ¶ 3 (Aug. 27, 1991) ("use of the [manual] is mandatory"). An agency must base its decision on the factors directed by Congress. *Zero Zone*, 832 F.3d at 668. Congress's intent is clear.

Though mandatory, the manuals allow for discretion and agency judgment—with the caveat that reasons for any deviation be documented [R. 123]. This documentation is essential for a reviewing court to assess whether the agency's decision is adequate under law, based on consideration of all relevant factors. Courts afford "no deference to agency decisions that lack record support or explanation[.]" *Orchard Hill*, 893 F.3d at 1027. Thus, when an agency follows a procedure inconsistent with the manuals, an arbitrary and capricious conclusion can only be avoided if the deviation includes a sufficient explanation why. *See Boucher*, 934 F.3d at 535; *Orchard Hill*, 893 F.3d at 1027.

4.  *Specific Federal Regulations and Guidance Govern Jurisdictional Wetlands.*

"Wetlands are among the most productive ecosystems in the world, comparable to rain forests and coral reefs."[5] "[They] are not simply moist patches of earth." *Rapanos*, 547 U.S. at 761. A wetland is an area "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

To find a wetland, the Corps looks for the existence of three factors: "(1) prevalence of plant species typically adapted to saturated soil conditions . . .; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in

---

[5] United States Environmental Protection Agency, *Why are Wetlands Important?* (March 31, 2021) https://www.epa.gov/wetlands/why-are-wetlands-important.

oxygen . . .; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years." *Rapanos*, 547 U.S. at 761; *see also* R. 127-49. All three factors (vegetation, hydric soil, and wetland hydrology) must be present under normal circumstances. *Rapanos*, 547 U.S. at 761; *Boucher*, 934 F.3d at 533.

Finding these three factors isn't always easy. Natural and artificial activities present a challenge for assessing jurisdiction based on these three factors alone. For example, draining, leveling, and cleaning activities can make it difficult to determine the existence of water, what type of soil goes where, or if wetland vegetation would normally grow [R. 188-198]. When a modification has recently occurred, resulting in the "removal or covering of indicators of one or more wetland parameters," applying the typical three-factor assessment would result in a no-wetland finding [R. 188-89]. Consequently, under these "atypical situations," the Corps' guidance directs a wetland assessment to proceed under a different framework [R. 188]. *See Boucher*, 934 F.3d at 535 (in atypical situations regulators "have guidance they can and should follow"). For instance, if an inspector "suspect[s] that hydrology had been altered, then their obligation [is] . . . to determine whether the fields could have had wetland hydrology." *Id.* at 548 (emphasis omitted).

Recognition of any alteration is essential before the agency can make a wetland finding. The importance of this step is reflected in the methodological pathway within the *Wetlands Delineation Manual* [R. 167]. Deciding whether an atypical situation exists, based on the presence of a recent alteration, is the second procedural step of the entire jurisdictional process, only preceded by locating the project site in the first instance [*id.*].

An atypical situation means "there is evidence of sufficient natural or human-induced alteration to significantly alter the area vegetation, soils, and/or hydrology" [*id.*]. Alterations that obligate this alternative review include the construction of levees, drainage systems, or dams that significantly alter the area hydrology [R. 188-89]. The temporal aspect of these changes is left broad—

"recent." The manual directs that if there are any alterations, the assessment is an "atypical situation" [R. 167]. *See Boucher*, 934 F.3d at 535.

In an atypical situation, the agency must first decide whether the changes have become the "normal circumstances" of an area [R. 361-62]. Recognizing that some individuals "attempt to eliminate the permit review requirements of [the CWA] by destroying" indicators of a wetland, the use of "under normal circumstances" obligates consideration of the property as if those alterations were not made [R. 119]. *See also* RGL 86-09 ¶¶ 3, 4.[6] The existence of normal circumstances is based on "an area's characteristics and use, at present and in the recent past," RGL 86-09 ¶ 5, and rely on "an evaluation of the extent and relative permanence of the physical alteration of wetlands hydrology and hydrophytic vegetation" and "the purpose and cause of [] physical alterations to hydrology and vegetation" [R. 119 (citing RGL 90-07)].

The Corps argues that RGL 90-07 has been rescinded and thus has no effect [ECF 64 at 51 n.16]. RGL 90-07, which describes the difference between farmed wetlands and prior converted cropland under normal circumstances, was rescinded by the Corps in 1993 by RGL 93-03. However, RGL 90-07 has since survived judicial review, *United States v. Hallmark Const. Co.*, 30 F. Supp.2d 1033, 1038 (N.D. Ill. 1998) ("RGL 90–7 remains the definitive regulatory guideline for agricultural wetlands"); and references to RGL 90-07 remain in the *Wetlands Delineation Manual*, which was updated after 1993 [R. 112 (citing an updated guidance document from 1997); 119 (defining "normal circumstances" based on RGL 90-07)]. Further, the Corps explicitly adopted the definitions of prior converted farmland and farmed wetland as described in the guidance as a basis to differentiate between

---

[6] Regulatory Guidance Letters (RGLs) don't carry the force of law. However, they consist of the Corps' understanding and interpretation of existing regulations. Unless the guidance is "superseded by specific provisions of subsequently issued regulations or guidance, the content provided in RGLs generally remains valid after the expiration date." RGL 05-06 (stating that RGLs issued before 2002 which include specific expiration dates remain valid after expiration date). Unless specifically superseded or otherwise incorporated, the policy guidance articulated in an RGL remains the agency's policy even after the guidance letter expires.

uplands and wetlands. *See* 58 Fed. Reg. 45,008, 45,031-32 (Aug. 25, 1993) (adopting the definitions of prior converted wetland and farmed wetland from the Food Security Act as a reasonable basis to distinguish between wetlands and non-wetlands). Finally, the distinction between agricultural wetlands that were or were not converted remains in the Midwest supplement [R. 360]. Thus, because the Corps and its manuals all rely, either directly or substantively, on this guidance, the court sees no reason to disregard the RGL when the Corps' own policy materials have not.

Following this guidance, the Corps must describe the alteration, ascertain when the alteration occurred, and characterize the alterations and the land as it existed before the alterations [R. 190-196]. The Midwest supplement outlines how to describe these features for properties like Natural Prairie's land [R. 360-63]. If the normal circumstances of the property demonstrate that any wetland that once existed has long ago been completely drained and converted to upland (non-wetland), then the normal circumstances of the land is upland and the agency may reasonably use the typical situation methodology. If the normal circumstances of the property demonstrate that currently-missing wetland indicators would otherwise be present but for the recent alteration, the Corps cannot assume only upland exists and must instead assess the site using the methodologies reserved for atypical situations. This threshold step ensures that jurisdiction cannot be overcome by alterations to hydrology and vegetation—alterations for the purpose of avoiding regulations. *See* RGL 86-09 ¶ 4.

The normal circumstances of Midwest farmland present yet another layer of review. Midwest farmland—often located on historical wetlands—by its nature often involves alterations to the vegetation, hydrology, and soil [R. 360]. These lands often lack the presence of natural plants because crops have been planted, or the lands have been altered by mowing, grazing, or other farming or land management practices [*id.*]. Therefore, the assessment of normal circumstances requires determining if the land has become "prior converted cropland" or remains a wetland despite farming activities. *See* 58 Fed. Reg. at 45,031-32 (adopting the definitions of prior converted wetland and farmed wetland

from the Food Security Act as a reasonable basis to distinguish between wetlands and non-wetlands); RGL 90-07 ¶¶ 5(a), (b).

Prior converted cropland is wetland that was manipulated and cropped before December 23, 1985, which no longer contains key wetland indicators. *See* 33 C.F.R. § 328.3(a)(8); 7 C.F.R. § 12.2(a)(8); RGL 90-07 ¶ 5(a). Conversely, a farmed wetland is a wetland that was manipulated and cropped before December 23, 1985, but which still contains key wetland indicators. *See* 7 C.F.R. § 12.2(a)(4); RGL 90-07 ¶ 5(b). A farmed wetland could still be a jurisdictional wetland, but prior converted cropland is non-jurisdictional. 33 C.F.R. § 328.3(a)(8). Thus, when recent alterations are present on agricultural land, before the Corps can decide whether to use the typical situation methodology or the atypical situation methodology, a detailed assessment of the changes in the hydrology, vegetation, and soil must occur. And specific to Midwest farmland, the mere presence of agricultural activity is not sufficient to overcome an assessment of the hydrology of the property [R. 360]. The Corps assumed, without seeming support or analysis, that Natural Prairie's land was prior converted cropland.

Because of that finding, the Corps never proceeded to the next step. When the Corps determines a wetland exists (as opposed to prior converted cropland), it then considers whether the wetland falls within the jurisdiction of the CWA. Some, but not all, wetlands are jurisdictional waters of the United States. Only when a wetland possesses the requisite nexus to a jurisdictional waterway, "either alone or in combination with similarly situated lands in the region, significantly affect[ing] the chemical, physical, and biological integrity of other covered waters more readily understood as navigable," does the wetland become jurisdictional. *Rapanos*, 547 U.S. at 780; *see also Orchard Hill*, 893 F.3d at 1022, 1025-26 (applying the significant nexus test). When the hydrology of a wetland meaningfully interacts with a water of the United States, be it a river or lake or tributary or ditch, the wetland becomes a water of the United States. *Rapanos*, 547 U.S. at 780-81.

5.      *The Corps' Prior Converted Cropland Conclusion was Arbitrary and Capricious.*

At times the parties offer various arguments about what is required to support a jurisdictional decision in typical and atypical situations, but these arguments rest on the Corps' foundational conclusion that the site was prior converted cropland and not farmed wetland. The associations challenge the Corps' foundational finding that this site was prior converted cropland.

"A court is not to substitute its judgment for that of the agency." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). If a path between the relevant factors and the agency's decision can be reasonably discerned, a court should uphold the agency's action. *Id.* at 513-14. That said, an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* at 515. The Corps is required to follow its guidance when making a jurisdictional determination. *See Boucher*, 934 F.3d at 547-48. When the agency needs to deviate from this guidance, its reasons should be documented to facilitate judicial review [*see also* R. 123]. The court must assess whether the Corps followed its policies and guidance, which identify the relevant factors, in making its decision. If the agency departed from its guidance or policies, the reasons "must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973).

Ditches and drainage tiles both impact hydrology, though in different ways [R. 360-61]. Generally, open ditches lower the water table in the area adjacent to the ditch [*id.*]. Alternatively, subsurface drainage tiles lower the water table more consistently across the property [*id.*]. The impact and scope of these drainage systems depend on numerous site-specific characteristics, including not only the location, depth, and spacing of the systems, but also the specific pedological, geological, and meteorological factors of the site [*id.*]. The methodology is based then not on the normal circumstances of the land before rather historic alterations, but instead the normal circumstances of

the land before recent alterations occurred [*see* R. 193 (atypical situation methodology does not apply to alterations that occurred before 1985)]. Failure to follow this method, absent an explanation why, is arbitrary and capricious. *See Boucher*, 934 F.3d at 547.[7]

The parties don't dispute that Natural Prairie made several alterations to the land before contacting the Corps. These changes involved extensive filling and tiling of numerous medial and lateral ditches, including at the headwaters of the Bogus Island Ditch—area indicated as a potential wetland at the time of the jurisdiction determination [R. 53]. The agency inspector even acknowledged that these activities may have impacted jurisdictional waters [R. 72]. These alterations should have triggered the Corps' atypical situation review [R. 188-89]—at least until the normal circumstances of the property were adequately characterized. Nevertheless, when the Corps made its jurisdictional determination, it stated the normal circumstances of the property was upland, and then it relied on an assessment of the land by Natural Prairie's environmental consultant finding no wetlands using the typical situation methodology [R. 421]. Despite the presence of hydric soils, the Corps concluded there was no wetland vegetation or hydrology, so the land was not a wetland.

The Midwest supplement recognizes that the ubiquity of agriculture in the Midwest makes it difficult to identify wetlands: planting and fertilizing affect the soil conditions, crops affect vegetation, and drainage systems affect the hydrology [R. 360]. And thus, the balancing test of how and when interventions transform farmland from a wetland to an upland requires "the best information available to the field inspector, interpreted in light of his or her professional experience and knowledge of the ecology of wetlands in the region" [R. 359]. Though the court may assess whether the process used by the Corps is arbitrary and capricious, the ultimate conclusion of wetland or upland is just the type

---

[7] It is true, as the Corps agues, that the agency does not intend to assert perpetual jurisdiction over lands that, whether through natural or artificial means, haven't been wetlands in ages [ECF 64 at 26; RGL 86-09 ¶ 3]. But the narrow question the court is faced with deciding is whether the Corps followed its own procedures to conclude that no wetlands existed on the site prior to Natural Prairie's alterations.

of highly technical decision a generalist court often rightfully leaves to the capable hands of agency experts. The court still must evaluate what the Corps did: decide that the land was converted from a wetland to upland before 1985 without considering the impact of Natural Prairie's alterations.

Inspectors are provided tools and procedures that should be used and followed to assess if the manipulation of any of the three wetland indicators has transformed the land from wetland to upland [R. 361-363]. As agricultural use is a presumption of both prior converted croplands and farmed wetlands, this use cannot be the determinative feature. Instead, the impact of alterations made to the land, and specifically to its hydrology, drives the normal circumstances of a site [R. 360-63]. The Midwest supplement mandates that an inspector "consider whether a drainage system is present, how it is designed to function, and whether it is effective in removing wetland hydrology from the area" [R. 360]. These are relevant factors.

The Midwest supplement provides tools to consider these three relevant drainage factors: (1) the existing indicators of wetland hydrology; (2) five or more years of historical images assessed following the methodology outlined by the United States Department of Agriculture Natural Resource Conservation Service; (3) scope-and-effect calculations to assess the impact of ditches and subsurface drainage systems; (4) the effectiveness of existing drainage systems; (5) hydrologic data, including runoff, surface water, and groundwater models; and, (6) the hydrology of a site relative to appropriate wetland hydrology technical standards, including detailed descriptions of any modifications to site hydrology or changes to surface topography [R 362-63].

In the narrative of the agency's decision, the inspector noted the historical existence of wetlands at the site [R. 421]. He reviewed fourteen aerial photographs spanning from 1938 to 2017 demonstrating the presence of row cropping, but which did not "offer evidence of potential wetlands" [R. 421]. Finally, he reviewed "applicable maps and other resource material" [*id.*]. The inspector then referenced Natural Prairie's environmental consultant's assessment finding no wetlands after applying

the typical methodology [R. 421]. Based on this information, the inspector concluded the site was used for agricultural purposes since 1939 and all wetlands were converted to uplands before 1985 [R. 421]. The Corps argues that this is enough, specifically highlighting the land's historic agricultural use; but the Midwest supplement disagrees.

Despite referencing both manuals, absent from the inspector's narrative is any description of the prior drainage system (the series of medial and lateral ditches transecting the property before Natural Prairie's alterations), Natural Prairie's new drainage system, how these systems were designed to function, and whether they were effective in removing wetland hydrology from the area. Indeed, looking to the narrative alone, the inspector's conclusion was reached without any consideration of the hydrology of the land before Natural Prairie's alteration [R. 421-22].

In recognition of the substantial deference courts give to agencies making technical decisions, the court turns to the reported data sources the agency used to make its jurisdictional determination.[8] Looking to these sources, but for the aerial photographs there is an absence of the data identified in the Midwest supplement to assess the relevant drainage factors, including how the existing and current drainage systems were designed to function, whether they were effective in removing wetland hydrology from the area, and when any conversion occurred. These relevant factors must be considered for agricultural lands [R. 360]. *See Boucher*, 934 F.3d at 548 (it is an inspector's "obligation . . . to determine whether the fields *could* have had wetland hydrology"). The absence of these sources, coupled with an absence of any meaningful discussion of the hydrology of the site before Natural

---

[8] The sources the inspector indicated he used to make his jurisdiction decision were a map of the two places where Natural Prairie's environmental consultant tested for wetlands after Natural Prairie's alterations began; a U.S. Geological Survey map of surface water networks (rivers, streams, etc.) identifying Lawler Ditch and Bogus Island Ditch as waters of the United States; a soil survey indicating the presence of hydric soil (a wetland indicator); a United States Fish & Wildlife Service National Wetlands Inventory map from 2018 indicating a small wetland in the area Natural Prairie altered; a 1929 National Geographic flood plan elevation map showing the elevation of the site was the same as the elevation of the surrounding wetlands; and the Indiana Drainage Handbook [R. 53, 435-36].

Prairie's alterations, reveal that the Corps didn't follow the procedures outlined in its own guidance when it decided the land was prior converted cropland.

Still recognizing the deference afforded to an agency's technical expertise, the court looks beyond the identified data sources, now to the whole administrative record, for any suggestion that the Corps considered these relevant factors. Though in the context of assessing whether the lateral ditches were jurisdictional waters, the Corps notes the existence of small upland "irrigation channels" [R. 71, 435, 437]. A map of the ditches is included [R. 99]. But there is no subsequent indication that the Corps considered the impact of the pre-Natural Prairie drainage system or the impact of the new drainage system on resulting drainage patterns [*compare* R. 421 *with* R. 362]. There is no indication in the record that the aerial photographs were used to assess hydrology (record merely states "no wetlands") [*compare* R. 421, 436 *with* R. 362]. And likewise, there is no indication in the record that the Corps considered groundwater and runoff models, historical meteorological data (including rainfall and weather conditions), scope and effect drainage equations, topographical changes made to the property, the water table, or comparisons to any refence wetland sites or hydrological indicators [*compare* R. 421, 436 *with* R. 360, 363]. Though the Corps lists an Indiana Drainage Guide as a source, it does not cite it for the wetland determination [R. 433-34]. Indeed, the only reference to this guide is made in the context of assessing the Bogus Island and Lawler Ditches as waters of the United States [R. 422]. There is no indication in the record of what this guide contains, if this guide was used to characterize the hydrology, or how the conclusions were verified as required by the Midwest supplement [*compare* R. 437 *with* R. 363]. Finally, there is no indication that the inspector's field visit characterized the existing drainage system before Natural Prairie's filling and tiling, or the impact of the new drainage system, to consider the pre-alteration hydrology.

Despite an obligation to assess the hydrology of the land, absent from the administrative record is any indication of a meaningful consideration of the nature and characteristics of the

hydrology of the land as it existed prior to Natural Prairie's alterations, how the drainage systems were designed to function, and how effectively and efficiently they could convert land from wetland to upland [R. 362-63 (describing obligatory considerations)]. There is also no explanation why these steps were skipped. Nevertheless, the Corps concluded the land was drained (in some way) and the drainage systems (at some point) converted it into upland. "Maybe the assumption was defensible, but the Corps does not provide record support for that assumption." *Orchard Hill*, 893 F.3d at 1027.

An assessment of normal circumstances, like any agency conclusion, must be based on all the relevant factors. But the court's review of the administrative record leaves substantial gaps from the data the Corps used to the conclusion the Corps made. These gaps are so significant that the court is left with the firm conviction that the Corps did not follow its own guidance and procedures when it concluded that Natural Prairie's land was prior converted cropland before Natural Prairie's alterations. The court recognizes that the Corps conducted this assessment during its "busy season" [R. 443], but the administrative record before the court does not support deference here.

Nor does the Corps fill these gaps through its briefing. Instead, the Corps stands by the assertion that review of arial photographs is enough to demonstrate the normal circumstances of the land. The Corps attempts to shore up this assessment by citing to the Midwest supplement describing the different ways aerial photographs can be used, including identifying inundation through dark spots on the land and tracking stunted plant growth [R. 341-42; 356-57]. But the Corps cites to acceptable wetland identification procedures in typical situations. And even so, the record does not indicate what factors the inspector considered in these photographs. It is simply silent on how the inspector's conclusion that no wetlands existed on the site was reached.

Rhetorically recognizing that an assessment of normal circumstance hydrology is absent from the record, the Corps attempts to string together evidence that such an assessment is there. It directs the court to the historical photographs and the agency's conclusion that Bogus Island and Lawler

Ditches were jurisdictional waters [R. 85-99, 422, 436]. The Corps states that the photographs clearly show no water in the lateral ditches, so they could not be draining any aquatic resource.[9] But this conclusion didn't come from the inspector. Indeed, the inspector, though commenting on the existence of water in Bogus Island and Lawler Ditches, said nothing at all about whether water was or was not historically present in the existing drainage system [R. 422, 436]. Instead, when discussing the lateral ditches, the inspector noted the single portion of one lateral ditch left unfilled by Natural Prairie was dry and did not have an ordinary high-water mark on the day he visited—both indicators of a different jurisdictional inquiry and confined to the conditions of that lateral ditch after alterations were made [*id.*].

The court wonders whether the argument the Corps is trying to make is that hydrology was obviously considered because, if water existed in the lateral ditches, the inspector would have said something. But the only evidence on which the Corps relies is a map of the site marking all medial and lateral ditches, a soil map for the property showing hydric soil, and the inspector's conclusion that the Bogus Island and Lawler Ditches were jurisdictional waters [R. 99, 101-102, 433-34]. This evidence does not support the Corps' argument that the inspector's decision was rationally based on the identified relevant factors, leaving the Corps with only *post hoc* justifications that the court cannot accept. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).[10]

---

[9] Accepting the Corps' invitation to speculate about the existing dark lines in old photographs, and using the inspector's guidance that water can be seen in the Bogus Island and Lawler Ditches in these photograph, water would seem demonstratively present in the lateral ditches in the 1963, 1971, 1998, 2005, 2012, 2015, and 2017 images [R. 85-99].

[10] The Corps argues that it was not required to assess the existence of a wetland on the entire property because the NWI wetland map only noted a possible wetland in two places. The Corps Manual notes that the use of NWI maps, which track potential wetlands in the United States, can help an inspector efficiently target the area of inspection [R. 153]. But even so, limiting the field of review does not provide leave to bypass the obligatory considerations within the targeted area.

"The APA requires meaningful review," *Dickinson*, 527 U.S. at 162, and a reviewing court should not attempt to plug holes in an agency's reasoning or "supply a reasoned basis for the agency's action that the agency itself has not given," *Zero Zone*, 832 F.3d at 668. On this administrative record, there is no support for the conclusion that the Corps considered the relevant hydrological factors identified in its guidance before concluding the land was prior converted cropland. Further, if the Corps concluded that reliance on its own manuals was not warranted, it needed to explain why to allow the court to follow the agency's path from relevant factors to conclusion. The decision was thus arbitrary and capricious. Remand is required so that the agency may issue a decision that complies with its procedural requirements. *See Regents of University of California*, 140 S. Ct. at 1907-8.

6.    *The Lateral Ditch Conclusion was Arbitrary and Capricious.*

The associations argue that the Corps' finding that the lateral ditches were not waters of the United States should be set aside because the Corps' conclusions about the relative permeance of water in the lateral ditches, and that the lateral ditches were irrigation canals made of upland, were not supported by the evidence and were contrary to law. The Corps and Natural Prairie contest this, arguing the administrative record supports both conclusions.

Although not necessarily navigable, ditches can be jurisdictional tributaries under certain circumstances [R. 413 n.24]. 33 C.F.R. § 328.3(a)(5). A ditch is a jurisdictional water of the United States if it carries water directly or indirectly into a traditional navigable water either with a relatively permanent flow or is excavated out of and drains a jurisdictional wetland [R. 413 n.24, 415, 419]. Relatively permanent flow means that the ditch typically flows with water year-round or has continuous flow for at least three months [R. 413-14].

To conclude whether a ditch has relatively permanent flow, the inspector looks for flow indicators at the farthest downstream limit of the tributary—the point where it enters a "higher order stream" [R. 413 n.24, 417]. The Corps directs its inspectors to consider various factors when

characterizing such a waterbody, including general area conditions and duration of saturation; relationships with the traditional navigable waterway; general tributary characteristics; the flow of water in the tributaries (the existence of beds and banks, an ordinary high-water mark and the factors that support it); chemical characteristics, and the biological conditions [R. 430-32]. These are the relevant factors the Corps explicitly identifies in its Approved Jurisdictional Determination Form [R. 428].

The Corps will also assert jurisdiction even if the ditch does not have a relatively permanent flow, so long as it has a significant nexus to a jurisdictional waterbody [R. 415]. A ditch has a significant nexus to a jurisdictional waterway when "either alone or in combination with similarly situated lands in the region, [it] significantly affects the chemical, physical, and biological integrity of other covered waters more readily understood as navigable." *Rapanos*, 547 U.S. at 780; *accord Orchard Hill*, 893 F.3d at 1022, 1025-26. Therefore, when the hydrology of a ditch meaningfully interacts with a water of the United States, it likewise becomes a water of the United States. *Rapanos*, 547 U.S. at 780-81.

Thus, a ditch will be a jurisdictional water of the United States if it: (1) was excavated out of wetlands and has a relatively permanent flow or a significant nexus to a jurisdictional waterbody, or (2) was excavated out of uplands but has a relatively permanent flow or a significant nexus to a jurisdictional waterbody [R. 415, 419]. The Corps does not assert jurisdiction over ditches excavated out of upland and draining only uplands without a relatively permanent flow or significant nexus [R. 419].

The associations say the Corps' conclusion that the lateral ditches were irrigation canals draining uplands was not supported by any evidence in the record. The Corps responds that the record supports its wetland conclusion and that the lateral ditches must have been excavated out of upland.

The court has already concluded that, based on the entire administrative record, the agency's wetland determination was arbitrary and capricious. Therefore, it cannot subsequently support the

agency's irrigation canal finding. To the extent that the inspector's conclusion that the lateral ditches were non-jurisdictional was based only on the lateral ditches being excavated out of and draining only uplands [R. 422, 435-36], that conclusion is also arbitrary and capricious. *See Van Abbema*, 807 F.2d at 639 ("If the Corps bases its conclusions on entirely false premises or information . . . [a reviewing court] would have difficulty describing its conclusions as reasoned; [it] would have to call them arbitrary and capricious.").

In addition to the irrigation canal finding, the Corps argues that it made an independent jurisdictional tributary finding based on the flow of the lateral ditches, and that the record provides ample support for this alternative conclusion. The associations argue that this independent tributary finding is absent from the record.

Before Natural Prairie's application, it engaged in various ditch filling activities on the property. The lateral ditches that existed on the land before these activities all connected to either Bogus Island Ditch or Lawler Ditch, which are waterbodies of the United States [R. 99]. Natural Prairie's filling activities were so invasive that when the inspector came to see the site and meet with Natural Prairie's owner and his attorney (well over a year after alterations began [R. 98 (2017 aerial image showing alterations)], he was able to access only one small portion of a lateral ditch left unfilled [R. 72].

Relying on the statements of Natural Prairie that the filled lateral ditches were even less of a jurisdictional water than the portion on display, the inspector noted that the portion he viewed had a bed and bank, no high-water mark indicators, no water was currently present, and was filled with plants [R. 72]. Despite concluding that Lawler and Bogus Island Ditches were both jurisdictional waters, the Corps used its observations about the existence of plants, the absence of water, and the lack of an ordinary high-water mark, to conclude that all lateral ditches were non-jurisdictional irrigation canals made of and draining only upland [R. 436].

The Corps argues that this conclusion included both the finding that the lateral ditches were non-jurisdictional because they were excavated out of upland and they were non-jurisdictional because they lacked relative permanent flow—meaning they were not filled with water at least three months in an average year [R. 413-14]. As the Corps notes, the key regulatory inquiry for this latter finding is whether the lateral ditches had relatively permanent flow.

But Natural Prairie's alterations made an assessment of flow characteristics where the ditches entered the higher order streams (here, the Bogus Island and Lawler Ditches) impossible [R. 98]. So instead, the inspector traveled to the remaining portion of one lateral ditch, a location "to the north," asked Natural Prairie if the other lateral ditches were similar, then assumed, based on Natural Prairie's assurances, his findings bore on all lateral ditches on the land [ECF 72]. The inspector noted the presence or absence of three flow characteristics as they existed on the day of his visit, namely the existence of a bed and banks, the lack of water, and a lack of an ordinary high water mark [R. 422, 436]. Without doing a measurable, much less significant nexus analysis, the inspector concluded the lateral ditches were non-jurisdictional.

A review of the administrative record indicates that the inspector skipped the portion of the jurisdictional determination devoted to an assessment of the lateral ditches as tributaries [R. 430-31]. However, a decision can still be rational and based on the relevant factors even when the correct boxes aren't checked. So, once more, the court looks to the whole administrative record.

The agency argues that the inspector rationally concluded that the lateral ditches were not jurisdictional tributaries based on the inspector's review of historical aerial photographs of the site, a U.S Geological Survey map, a soil map, and the National Geographic Flood Plan map [ECF 64 at 31-33; R. 85-99, 101-02, 104]. But the reasons the aerial images did not support a conclusion that the inspector considered the hydrology of the lateral ditches in the context of wetlands likewise apply to

this conclusion. He says nothing about the existence of water, let alone its relative permanence, in the lateral ditches.

The maps the Corps cite, which the inspector did not identify, fare no better. The U.S Geological Survey map, which the agency argues does not designate the lateral ditches as streams or rivers [ECF 64 at 31], also does not designate Bogus Island and Lawler Ditches as streams or rivers [R. 99]. Instead, it identifies all the ditches, lateral and medial, as canals and ditches. The National Geographic Flood Plan Map, which the agency argues notes the location of only Bogus Island and Lawler Ditches, differentiate those ditches in name alone (both Bogus Island and Lawler have names, but the lateral ditches, while present on the map, do not) [R. 104]. Finally, the soil map, which the agency says only designates Lawler and Bogus Island Ditches as streams or rivers, also designates one of the lateral canals in the same manner [R. 102-04]. The record provides no explanation as to if or how these factors were considered, and indeed no indication of how the conclusions were reconciled from this data. The Corps' *post hoc* rationalizations in briefing are not afforded deference.

Agency guidance states that when physical characteristics of relatively permanent flow "are inconclusive, misleading, unreliable, or not evident, the Districts' written documentation will include information about the physical characteristics (or lack thereof) and other appropriate means that consider the characteristics of the surrounding areas, which it used to determine the [ordinary high water mark]." RGL 05-05 ¶ 3(e). The Corps directs its inspectors to document its conclusions, its deviations from the standard procedures, and the reasons why—documentation that would help a reviewing body follow the agency's reasoning for deviating from the guidance. Here, there is not only no indication of the procedures (or their adequacy) employed by the inspector to assess the flow characteristics of the filled lateral ditches, but also no explanation that the inspector made a finding about the jurisdiction of any of the lateral ditches independent of its upland irrigation canal finding.

Putting aside the wetland conclusion, the inspector's lateral ditch finding is not consistent with agency guidance. When a ditch excavated out of upland flows directly or indirectly into a traditionally navigable waterway, the permanence of the flow is not dispositive over the existence of jurisdiction [R. 417]. Instead, the inspector has an obligation to conduct a significant nexus assessment and conclude jurisdiction based on "the flow characteristics and function of only the tributary itself in determining whether such tributary has a significant effect on the chemical, physical, and biological integrity of downstream traditional navigable waters" [*id.*].

However, evidence that the Corps considered or conducted any significant nexus evaluation is absent from the record, despite the aerial image demonstrating all tributaries were connected to the Bogus Island and Lawler Ditches [*see, e.g.*, R. 97 & 422]. The inspector also left this section blank [R. 433]. The administrative record likewise indicates no such analysis was considered. This unremarked-upon omission of an analysis required by both agency guidance and judicial precedence renders the decision arbitrary and capricious. *See Rapanos*, 547 U.S. at 780-81; RGL 05-05 ¶ 3(e); R. 417.

Finally, Natural Prairie's alterations significantly limited the areas inspected by the Corps. Accordingly, the inspector applied his conclusion from the unaltered ditch to all lateral ditches on the property. For this assumption to withstand scrutiny under the APA, the record evidence must reasonably support the inspector's conclusion that all of the lateral ditches were similarly situated to the one he viewed. *See, e.g.*, *Orchard Hill*, 893 F.3d at 1027.

The record indicates that the inspector asked Natural Prairie about the other lateral ditches, who stated they were all the same. The inspector's assumption thus has some basis in the record, albeit scant. Record evidence of similarity must be concrete, not sparse. *See id.* It was the agency's obligation to substantiate this assumption and explain why it was reasonable. *Id.* ("The Corps may not need to defend the use of NWI data, but it does need to substantiate its say-so about what the NWI data

shows and explain why it matters."). An explanation, or any evidence of its veracity, is absent from the record.

"While we review the Corps' determination narrowly, no amount of agency deference permits us to let slide critical findings bereft of record support." *Orchard Hill*, 893 F.3d at 1027. When holes exist in agency reasoning, holes that should be (but aren't) filled by the administrative record, it is not the court's job to fill them. Remand instead is necessary. Support in the record for a conclusion that the lateral ditches all lacked relatively permanent flow is vague at best. Evidence or an explanation that the lateral ditches were similarly situated is absent. A significant nexus analysis is omitted. These critical findings aren't entitled to deference. The agency's conclusion that the lateral ditches were not waters of the United States must be remanded so that the Corps may reassess its decision in light of its wetland findings and follow its guidance. *See Regents of University of California*, 140 S. Ct. at 1907-8.

C.      *HEC's Motion to Admit Extra-Record Evidence is Denied as Moot.*

Along with its summary judgment motion, the associations moved to admit extra-record evidence arguing that the admission of extra-record evidence is necessary for the court to conduct an adequate review of the Corps' decision. Because the Corps' actions were arbitrary and capricious based on the administrative evidence alone, the court declines the invitation to belabor this point.

D.      *The Corps' Motion for Leave to File a Reply in Support of its Crossmotion for Summary Judgment and Surreply in Opposition to Summary Judgment is Denied.*

On September 2, 2020, two months after the Corps filed its crossmotion for summary judgment, and 19 days after the associations filed their consolidated response and reply, the Corps moved for leave to file a reply in support of its crossmotion for summary judgment and submit a surreply to oppose the associations' summary judgment motion. The associations objected.

First, to the surreply: Local Rule 7.1(a) permits parties to file an initiating brief, a response, and a reply, but it does not address the filing of a surreply. N.D. Ind. Local R. 7.1(a); *Savage v. Finney*, 2011 U.S. Dist. LEXIS 99325, 2-3 (N.D. Ind. Sept. 2, 2011). The court will only allow a litigant to file

36

a surreply when it responds to a new argument, describes some development in the law, or rests on other unique considerations. A party must first seek leave of court to file a surreply. The court needs no further elucidation, so it denies the motion. *See, e.g., United States v. Hodgekins*, 805 F. Supp. 653, 656-57 (N.D. Ind. 1992).

As to the reply, the briefing schedule established by the court (this judge's predecessor) required the associations to submit their reply to their summary judgment motion, which doubled as a response to the Corps' cross-motion for summary judgment, on August 14, 2020 [ECF 69]. They did so [ECF 71]. Thus, had the Corps wished to file a reply, it had until August 28, 2020 to do so, *see* N.D. Ind. L. R. 56-1, else ask the court to extend the deadline. The Corps didn't. Instead of moving to extend the deadline, or asking the court for leave to file a reply when cross-moving, the Corps argues that it should be entitled to file this reply/surreply precisely because it *didn't* do those things. This is not good cause. Thus, the Corps' motion to file a reply/surreply is denied.

CONCLUSION

This case remains a dispute about a dairy farm; but the jurisdictional decision made by the Army Corps of Engineers that most of the dairy farm was not subject to the Clean Water Act was arbitrary and capricious. The court DENIES the Corps' amended motion to file a reply and surreply [ECF 74], DENIES AS MOOT the Corps' original such motion [ECF 73], DENIES the plaintiffs' motion to admit extra-record evidence [ECF 55], DENIES Natural Prairie's summary judgment motion [ECF 45], DENIES the Corps' crossmotion for summary judgement [ECF 63], and GRANTS the plaintiffs' summary judgment motion [ECF 54]. The court REMANDS the Administrative Jurisdictional Decision to the Corps for reconsideration of its jurisdiction over Natural Prairie's land consistent with this opinion.

SO ORDERED.

September 29, 2021                     *s/ Damon R. Leichty*
                                      Judge, United States District Court